COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| THE STANLEY WORKS D/B/A | | No. 08-11-00015-CV |
| STANLEY MECHANICS TOOLS, | § | |
| | | Appeal from |
| Appellant, | § | |
| | | 30th District Court |
| v. | § | |
| | | of Wichita County, Texas |
| WICHITA FALLS INDEPENDENT | § | |
| SCHOOL DISTRICT, | | (TC # 165,364-A) |
| | § | |
| Appellee. | | |

**O P I N I O N**

The Stanley Works d/b/a Stanley Mechanics Tools appeals from a judgment entered in favor of Wichita Falls Independent School District. We affirm in part, reverse in part and remand to the trial court for entry of judgment in accordance with this opinion.

**FACTUAL SUMMARY**

In May 1990, the Wichita County Commissioners Court adopted an order establishing guidelines and criteria for the designation of reinvestment zones and entry into tax abatement agreements pursuant to the Property Redevelopment and Tax Abatement Act contained in Chapter 312 of the Texas Tax Code. *See* TEX.TAX CODE ANN. §§ 312.001-312.403 (West 2008 and Supp. 2011). In June 1994, Stanley entered into a written Tax Abatement Agreement with Wichita County, Texas. WFISD became a party to the agreement in July 1994. Under the Agreement, Stanley agreed to make certain personal property additions and improvements to its tool manufacturing facility in Wichita Falls, Texas. The Agreement provided that Stanley would relocate to Wichita Falls certain equipment and processes from an existing Ohio facility. Stanley would also purchase additional equipment for the Wichita Falls facility. The parties

contemplated that the expansion would create an additional 100 jobs by the end of the expansion period.

Attached to the tax abatement agreement is Exhibit B which describes the three-phase project as follows:

Phase I - Projected Timing - June through December 1994

Scope of this phase will be the manufacture of 'Mac' Tool branded product, produced and distributed via jobbers. Ultimate distribution is to the independent professional mechanics. Manufacturing processes will include CNC turning (rough and final), grinding, polishing, marking, swaging, broaching and drilling. Products to be manufactured will include extensions, sockets, hex bits, wrenches and cold chisels.

Phase II - Projected Timing - March 1995

Final steps of closing down this Ohio manufacturing facility and absorbing all remaining production operation in Texas. Products and processes will expand what is part of first phase. Now it will include the manufacture of adapters, magnetic sockets, speeders, ratchets, impact universals and sockets.

With the completion of Phases I and II, we anticipate equipment having a value of approximately $3,700,000 will have been moved to our Wichita Falls facility. In addition, we expect the creation of approximately 170 new jobs; however, this will be offset by jobs being relocated to other Texas locations, netting the Wichita Falls facility approximately 100 jobs.

Phase III - Project Timing - 1994

Major investment in process equipment to produce 4" through 12" adjustable wrenches. Investment of this magnitude will allow us to increase capacity three times existing volume. This state of the art technology will allow us to become price competitive in the worldwide market. By becoming more competitive in the worldwide market, this will assure our continued growth in the volume of adjustable wrenches and expand our labor force.

Wichita County agreed to give Stanley declining ad valorem tax abatements on the additions and improvements for two ten-year periods.[1] The tax abatement for the Phase I and Phase III improvements began on January 1, 1995 and continued for a period of ten years. The tax

---

[1] The abatement began at 100 percent the first year of the abatement period and declined by 10 percent each year.

abatement for the Phase II improvements began on January 1, 1996 and likewise continued for a period of ten years. The Wichita Appraisal District (WAD) administered the tax abatement. Under the Agreement, Stanley was required to provide a certificate each year containing a general description and cost of the personal property and improvements added to the facility, and the number of jobs created since the commencement of the improvements or the previous certificate. Stanley had the right to protest any appraisal or assessment of the facility and any improvements or tangible personal property, and the tax abatement would be applied to the amount of taxes finally determined to be due following resolution of a protest.

The Tax Abatement Agreement provided that if Stanley "fails to make the personal property additions and improvements to the Premises which are described in this Agreement as Phase I, II, or III, respectively, [Stanley] shall repay all property tax revenue lost by the County as a result of this Agreement insofar as such lost tax revenue relates to the additions and improvements described in the particular Phase, subject to any and all lawful offsets, settlements, deductions or credits to which [Stanley] may otherwise be entitled; provided, however, the failure to make the additions and improvements in any particular Phase shall not adversely affect the tax abatement provided for herein with respect to any other Phase."

In 1994, Stanley created $1,969,108 in personal property additions to its Wichita Falls facility attributable to Phases I and III. In 1995, it made $1,352,608 of personal property additions to its Wichita Falls facility attributable to Phase II. From 1995 through 2001, Wichita County and WFISD abated $220,087.54 of ad valorem tax on Stanley's personal property that would have been owed by Stanley in the absence of the Tax Abatement Agreement. After 2001, Stanley stopped seeking tax exemptions and made no further personal property additions under

the Agreement. In 2002, Stanley moved its tool manufacturing operations out of Wichita County.[2]

On August 28, 2003, WFISD notified Stanley by letter that it had failed to make all of the personal property additions to its Wichita Falls facility as required by the Agreement, and consequently, it was obligated to pay all ad valorem tax revenue lost as a result of the Tax Abatement Agreement.[3] Stanley disagreed in a letter from its assistant general counsel. WFISD sent a letter to Stanley on May 24, 2006 demanding payment of the ad valorem tax lost under the Tax Abatement Agreement. Stanley did not make payment and WFISD filed suit alleging breach of the Tax Abatement Agreement and seeking recovery of the lost ad valorem tax revenue as damages. Stanley filed a general denial and additionally asserted that WFISD's claims were barred by Section 33.05 of the Texas Tax Code, laches, and estoppel.

Following a bench trial, the court awarded judgment in favor of WFISD in the sum of $220,087.54, pre-judgment interest in the sum of $74,251.11, and attorney's fees in the sum of $44,017.50. The trial court entered written findings of fact and conclusions of law.

## TAX CODE SECTION 33.05(A)(1)

In its first issue, Stanley contends the suit is barred by the applicable four year statute of limitations provided by Section 33.05(a)(1) of the Texas Tax Code. The trial court concluded that WFISD's suit is for breach of contract and it is not barred by limitations or laches. We review *de novo* the trial court's legal conclusions based on the findings of fact to determine their correctness. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). If we

---

[2] Stanley states in its brief there is no evidence to support the trial court's finding that Stanley left Wichita County in 2002, but the record reflects that counsel submitted a portion of Lisa Stephens-Musick's deposition to support an objection to her testimony. Stephens-Musick testified that "They closed down their facility during the term of the abatement agreement."

[3] On June 20, 2005, WFISD and Wichita County entered into an interlocal collection agreement whereby Wichita County appointed WFISD as its agent to pursue collection against Stanley and to file suit to enforce the Tax Abatement Agreement.

determine a conclusion of law is erroneous but the trial court nevertheless rendered a proper judgment, the erroneous conclusion does not require reversal. *Id*.

Section 33.05(a)(1) provides that: "Personal property may not be seized and a suit may not be filed: (1) to collect a tax on personal property that has been delinquent more than four years." TEX.TAX CODE ANN. § 33.05(a)(1)(West 2008). Stanley asserts that the Tax Abatement Agreement required that it make the improvements under Phases I and III by 1994 and the improvements under Phase II by 1995, and therefore, any breach of the Agreement occurred in 1994 and/or 1995. Stanley reasons that "[i]f it were true that Stanley failed to comply with the Abatement Agreement in 1994 and/or 1995, then any unpaid personal property taxes **necessarily** would have become delinquent 'more than four years' before this suit was filed in November 2006." [Emphasis in original.] WFISD responds that Section 33.05 is inapplicable because the statute only applies to suits to collect delinquent taxes and it did not sue Stanley to collect delinquent taxes, but rather it sought damages for Stanley's breach of the Tax Abatement Agreement. Whether Section 33.05 applies to a suit alleging breach of a Tax Abatement Agreement is an issue of first impression. Further, the parties' arguments raise an issue of statutory construction.

Statutory construction is a legal question that we review *de novo* in order to ascertain and give effect to the Legislature's intent. *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007). When construing a statute, we begin with its language. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We must interpret the statute according to the plain meaning of the language used, and must read the statute as a whole without giving effect to certain provisions at the expense of others. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). Words shall be given their ordinary meaning unless a word is connected with and

- 5 -

used with reference to a particular trade, subject matter, or is used as a word of art, and in such a case, the word shall have the meaning given by experts in the particular trade, subject matter, or art. TEX.GOV'T CODE ANN. § 312.002 (West 2005). Each word, phrase, or expression must be read as if it were deliberately chosen, and we will presume that words excluded from a provision were excluded for a purpose. *Gables Realty Ltd. Partnership v. Travis Central Appraisal District*, 81 S.W.3d 869, 873 (Tex.App.--Austin 2002, pet. denied). We may consider other matters in ascertaining legislative intent, including the objective of the law, its history, and the consequences of a particular construction. *See* TEX.GOV'T CODE ANN. § 311.023(1), (3), (5); *Shumake*, 199 S.W.3d at 284.

The application of Section 33.05 is restricted by its terms to a suit to collect a delinquent tax on personal property. The Tax Code does not define the term "delinquent.' Its ordinary meaning is a past due or unperformed obligation. BLACK'S LAW DICTIONARY 493 (9th Ed. 2009). Section 31.02 of the Tax Code, which is entitled "Delinquency Date," provides that "taxes are due on receipt of the tax bill and are delinquent if not paid before February 1 of the year following the year in which imposed." TEX.TAX CODE ANN. § 31.02(a)(1).[4] Citing Section 31.01(g), Stanley argues that the failure to send a tax bill does not affect the validity of the tax, and therefore, the taxes sought to be recovered in this case would have been due on February 1 of each year following the applicable tax year. *See* TEX.TAX CODE ANN. § 31.01(g)(West 2008 and Supp. 2011)("Except as provided by Subsection (f), failure to send or

---

[4] There are exceptions to this provision which do not affect our analysis and are inapplicable here. *See* TEX.TAX CODE ANN. § 31.02(b)(providing the delinquency date for an eligible person serving on active duty in any branch of the United States armed forces); TEX.TAX CODE ANN. § 31.03 (providing the delinquency date for a person who makes a split payment of taxes); TEX.TAX CODE ANN. § 31.04 (providing for the postponement of the delinquency date).

receive the tax bill required by this section, . . . does not affect the validity of the tax, penalty, or interest, the due date, the existence of a tax lien, or any procedure instituted to collect a tax.").[5]

The terms of the Agreement required Stanley to repay all lost property tax revenue if it failed to make the personal property additions and improvements under Phases I, II, and III. By its suit, WFISD sought to recover the amount of taxes which had been abated by virtue of the Tax Abatement Agreement from 1995 through 2001 because it contended, and the trial court found, that Stanley breached the Agreement by failing to make all of the required improvements and additions. It is undisputed that Wichita County and WFISD did not impose the abated taxes during either ten-year abatement period. Consequently, the abated taxes were not due on February 1 of each tax applicable tax year and the taxes did not become delinquent. We conclude that WFISD's suit is not a suit to collect delinquent taxes, and therefore, Section 33.05's limitations period is inapplicable. We overrule Issue One.

## LACHES

In its second issue, Stanley argues that WFISD's claims are barred by laches as a matter of law.[6]

### *Waiver*

WFISD maintains that Stanley waived this issue because it failed to request findings on the essential elements of this affirmative defense. Laches is an affirmative defense. TEX.R.CIV.P. 94. Therefore, it was Stanley's burden to plead, prove, and secure findings on its defense. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988). A party asserting

---

[5] Under subsection (f), a collector may provide that a tax bill not be sent until the total amount of unpaid taxes the collector collects on the property for all taxing units the collector serves is $15 or more. TEX.TAX CODE ANN. § 31.01(f).

[6] Stanley asserts in Issue Six that it conclusively established that WFISD's suit is barred by the statute of limitations, laches, and estoppel. Our discussion of Issue Two includes the portion of Issue Six addressing the affirmative defense of laches.

an affirmative defense in a trial before the court must request findings in support of the defense to avoid waiver. *Cooper v. Cochran*, 288 S.W.3d 522, 531 (Tex.App.--Dallas 2009, no pet.); *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 708 (Tex.App.--Fort Worth 2006, pet. denied). If the trial court's findings do not include any of the elements of the defense asserted, the party must specifically request additional findings relevant to the defense. *Cooper*, 288 S.W.3d at 531. The trial court's findings of fact did not include any elements of laches, but Stanley made a request for amended or additional findings that WFISD had the legal or equitable right to assert the claims made in this suit, it unreasonably delayed asserting its claims for almost twelve years after the alleged breach, and the delay impaired Stanley's ability to defend against the claim or to ascertain the true facts. We find that Stanley preserved the issue.

### Elements of Laches

Generally, laches is an affirmative defense comprised of two elements: (1) a party's unreasonable delay in asserting a legal or equitable right; and (2) a good faith and detrimental change of position due to the delay. *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 80 (Tex. 1989); *In the Matter of the Estate of Romancik*, 281 S.W.3d 592, 597 (Tex.App.--El Paso 2008, no pet.).

### Standard of Review

Findings of fact in a bench trial have the same force and dignity as a jury's verdict upon questions and are reviewed for legal and factual sufficiency of the evidence by the same standards. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The findings are not conclusive when, as in this case, a complete reporter's record appears in the record. *Tierra Sol Joint Venture v. City of El Paso*, 311 S.W.3d 492, 498 (Tex.App.--El Paso 2009, no pet.). We review the trial court's legal

conclusions *de novo*. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chemical Company v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). The reviewing court first examines the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Dow Chemical*, 46 S.W.3d at 241. If there is no evidence to support the finding, the reviewing court will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id*. To prevail on appeal, Stanley must demonstrate that the evidence conclusively established all vital facts in support of the affirmative defense of laches.

### Review of the Evidence

It is unnecessary to review the first element because Stanley failed to conclusively establish the second element of its laches defense. Stanley's sole argument is that evidence was lost and "witnesses had scattered" due to the passage of time. Stanley does not argue that it made a good faith and detrimental change of position due to the delay. It instead contends that when the delay is such that the defendant's ability to defend against the claim is impaired, then the plaintiff's claim should be barred. In support of its position, Stanley cites *De Benavides v. Warren*, 674 S.W.2d 353, 362 (Tex.App.--San Antonio 1984, writ ref'd n.r.e.), which in turn cited *Pearson v. American Fidelity & Casualty Company*, 321 S.W.2d 620 (Tex.Civ.App.-- Amarillo 1959, writ ref'd n.r.e.)[7] and *Brady v. Garrett*, 66 S.W.2d 502 (Tex.Civ.App. --El Paso

---

[7] In *Pearson*, 321 S.W.2d at 622, the Amarillo Court of Civil Appeals stated that: "Laches is not mere delay in bringing an action, but each delay working disadvantage to another, and operates as estoppel against assertion of a

1933, writ dism'd).[8] Assuming for the sake of argument that evidence of an impaired ability to defend can satisfy the second element, we conclude that Stanley failed to prove this element as a matter of law.

Lisa Stephens-Musick has been the deputy chief appraiser for the Wichita Appraisal District since 1999 and she is the custodian of the appraisal district's records. The evidence showed that WAD, in accordance with its records retention plan, destroyed the original renditions of personal property submitted by Stanley five years after each applicable tax year. Stanley did not offer any evidence to explain why it did not have copies of the renditions it had filed. Under the Agreement, Stanley had the right to protest any appraisal of the personal property, but there is no evidence that Stanley ever protested any of the valuations for the tax years in question. One inference to be drawn from this evidence is that Stanley accepted the valuations at the time they were made. Stanley does not direct our attention to where in the record it established that witnesses could not be located due to the delay nor is there any evidence indicating the substance of the witnesses' expected testimony. Stanley's bare claims that the renditions had been destroyed and witnesses had scattered do not conclusively prove that Stanley's ability to defend was impaired or that it made a good faith and detrimental change of position as a result of the delay. Issue Two is overruled.

---

right only when a party, knowing his rights, takes no steps to enforce them until condition of other party has, in good faith, become so changed that he cannot be restored to former state."

[8] In *Brady*, the Eighth Court of Civil Appeals stated that "laches in legal significance is not mere delay, but delay that works a disadvantage to another." *Brady*, 66 S.W.2d at 505.

**QUASI-ESTOPPEL**

In its third issue, Stanley contends that WFISD's claims are barred by quasi-estoppel as a matter of law.[9] Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit. *Id.*

*Waiver*

WFISD maintains that Stanley waived this issue because it failed to request findings on the essential elements of this affirmative defense. Quasi-estoppel is an affirmative defense. *Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 770 (Tex.App.--Fort Worth 2010, no pet.); TEX.R.CIV.P. 94. Therefore, it was Stanley's burden to plead, prove, and secure findings on its defense. *Woods v. William M. Mercer, Inc*., 769 S.W.2d 515, 517 (Tex. 1988). The trial court's findings of fact did not address any elements of quasi-estoppel, and Stanley's request for amended or additional findings did not include the elements of this defense. Consequently, Stanley waived this issue. Issue Three is overruled.

**DIVISIBLE CONTRACT AND LEGAL SUFFICIENCY**

In its fourth and fifth issues, Stanley contends that the Tax Abatement Agreement is a divisible contract and WFISD failed to prove that Stanley did not comply with its obligations in Phases I, II, or III and it failed to prove the amount of lost tax revenue related to the additions and improvements in each Phase.

---

[9] Stanley asserts in Issue Six that it conclusively established that WFISD's suit is barred by the statute of limitations, laches, and estoppel. Our discussion of Issue Three includes the portion of Issue Six addressing the affirmative defense of quasi-estoppel.

In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Insurance Company of America*, 341 S.W.3d 323, 333 (Tex. 2011); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). In identifying the parties' intent, "we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Italian Cowboy*, 341 S.W.3d at 333, *quoting J.M. Davidson*, 128 S.W3d at 229. We begin this analysis with the contract's express language. *Italian Cowboy*, 341 S.W.3d at 333. If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If, on the other hand, the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent. *J.M. Davidson*, 128 S.W.3d at 229. In such a case, a court may consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. *Italian Cowboy*, 341 S.W.3d at 333-34.

The divisible or indivisible nature of a contract cannot be ascertained by any one test or rule of law. *Johnson v. Walker*, 824 S.W.2d 184, 187 (Tex.App.--Fort Worth 1991, writ denied); *St. John v. Barker*, 638 S.W.2d 239, 243 (Tex.App.--Amarillo 1982), *aff'd*, 645 S.W.2d 261 (Tex. 1983). Determination of the issue depends primarily on the intention of the parties, the subject matter of the agreement, and the conduct of the parties. *Johnson*, 824 S.W.2d at 187; *St. John*, 638 S.W.2d at 243. If there is a single assent to a whole transaction involving several things, a contract is entire, but if there is a separate assent to each of the several things involved,

it is divisible. *Johnson*, 824 S.W.2d at 187; *St. John*, 638 S.W.2d at 243. A contract is divisible when the performance by one party consists of several distinct and separate items and the price paid by the other party is apportioned to each item. *Johnson*, 824 S.W.2d at 187; *Hamilton v. Texas Oil & Gas Corporation*, 648 S.W.2d 316, 320 (Tex.App.--El Paso 1982, writ ref'd n.r.e.), *disapproved on other grounds*, *Valence Operating Company v. Dorsett*, 164 S.W.3d 656, (Tex. 2005).

*The Intention of the Parties*

We begin by examining the intent of the parties as expressed in the contract. In support of its argument that the contract is divisible into three parts, Stanley first focuses on the language found in Section 2.1 of the Tax Abatement Agreement that: "The improvements contemplated by [Stanley] will consist of 3 Phases as more fully described in the attached Exhibit B." Phase I was projected to take place in June through December 1994 and involved the manufacture of "Mac" Tool branded products. The description of Phase I does not make any reference to personal property improvements or additions. During Phase II, which was projected to occur in March 1995, Stanley would close down its Ohio facility and absorb all remaining production in the Wichita Falls facility. Exhibit B further described Phase II as an expansion of Phase I and it stated that with the completion of Phases I and II, Stanley anticipated that equipment with a value of approximately $3.7 million would have been moved to its Wichita Falls facility. Phase III was expected to take place in 1994 and would involve a "[m]ajor investment in process equipment" to produce adjustable wrenches. Stanley anticipated that the investment in Phase III would allow it to increase capacity three times the existing volume. Section 4.4 of the Agreement provides the strongest indication that the parties intended to create a divisible contract. That section provides, in relevant part, that:

- 13 -

> If [Stanley] fails to make the personal property additions and improvements to the Premises which are described in this Agreement as Phase I, II, or III, respectively, [Stanley] shall repay all property tax revenue lost by the County as a result of this Agreement insofar as such lost tax revenue relates to the additions and improvements described in the particular Phase, subject to any and all lawful offsets, settlements, deductions or credits to which [Stanley] may otherwise be entitled; provided, however, the failure to make the additions and improvements in any particular Phase shall not adversely affect the tax abatement provided for herein with respect to any other Phase.

Section 4.4 plainly contemplates that the additions and improvements would be assigned to the relevant phase and the failure to accomplish one phase would not result in a loss of the tax abatement due under another phase.

WFISD argues that there are other provisions in the Agreement which reflect that the parties intended to create an indivisible contract. First, the Agreement does not provide for a separate tax abatement period for each Phase. Section 3.1(a) and (b) of the Agreement provides for only two abatement periods: there is a ten-year abatement period for the Phase I and III improvements (January 1, 1995 through January 1, 2005) and another for the Phase II improvements (January 1, 1996 through January 1, 2006). One reasonable interpretation of Section 3.1 is that the parties agreed to create only two abatement periods because Phases I and III were intended to begin in 1994 and Phase II would not commence until 1995. The creation of only two abatement periods does not reflect an intent for the contract to be indivisible.

WFISD also points to Section 5.1 of the Agreement as evidence that the agreement is indivisible. Section 5.1 addresses the sale, assignment, or lease of the property in question. That section provides that the tax abatement would "vest in [Stanley] upon substantial completion of the personal property additions and improvements described in Section 2.1 . . ." but the tax abatement was not "assignable to any new owner or lessee of all or any portion of the Premises without the prior written approval of the County." WFISD is correct that the section does not

- 14 -

provide that the tax abatement would vest upon substantial completion of the additions and improvements described in each phase. It is logical for the parties to agree that the tax abatement would not be assignable unless Stanley had substantially completed the entire undertaking. We do not read this provision as evidencing an intention to create an indivisible contract.

After reading the entire Agreement, we conclude that the parties intended to create a divisible contract. Any other conclusion would render Section 4.4 meaningless.

*Legal Sufficiency Standard of Review*

On appeal, a legal sufficiency or "no evidence" challenge will be sustained if the party suffering the adverse decision at trial shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidences establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *El Paso Independent School District v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.--El Paso 2006, no pet.). When conducting a legal sufficiency review, we must view the evidence in the light favorable to the verdict, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller*, 168 S.W.3d at 830. The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 827.

*Failure to Perform under Phases I and II*

The trial court concluded that in Phases I and II, Stanley was to move equipment valued at approximately $3,700,000 to its Wichita Falls facility for the manufacture of extensions, sockets, hex bits, wrenches, cold chisels, adapters, magnetic sockets, speeders, ratchets, and

impact universals. WFISD introduced evidence that in 1994 Stanley made $1,969,108 of personal property additions to its Wichita Falls facility attributable to Phases I and III. Lisa Stephens-Musick, the custodian of the appraisal district's records, testified that Phases I and III were included together in a single abatement account while Phase II was in a second account. Consequently, the personal property additions attributable strictly to Phase I are not separated from Phase III. In 1995, Stanley made $1,352,608 of personal property additions to its Wichita Falls facility attributable to Phase II. Given that the total value of personal property additions attributable to all three phases was $3, 321,716, the evidence is legally sufficient to show that Stanley failed to perform its obligations under Phases I and II.

*Failure to Perform under Phase III*

Phase III required Stanley to make a major investment in process equipment to produce adjustable wrenches. There is no evidence that Stanley failed to fulfill its obligation under Phase III.

*Amount of the Recovery*

The evidence showed that WFISD and Wichita County abated a total of $220,087.54 of ad valorem tax on Stanley's personal property that would have been owed but for the Tax Abatement Agreement. This figure included the abated taxes related to all three phases because the Phase I personal property additions were not separated from the Phase III additions. Under Section 4.4 of the Agreement, WFISD is only entitled to recover the lost property tax revenue related to the personal property additions and improvements made under Phases I and II. It is not entitled to recover the taxes abated for the improvements and additions made under Phase III.

With respect to the Phase II improvements and additions, the evidence showed that from 1995 to 2001 Stanley would have paid $69,776.78 to WFISD and $18,149.73 to Wichita County

- 16 -

for a total of $87,926.51 in abated taxes. Thus, the evidence is legally sufficient to support an award of damages in this amount.

WFISD had the burden to prove the amount of taxes abated for the improvements and additions made under Phase I. The evidence does not show the amount of taxes abated for the improvements and additions attributable to Phase I because the appraisal district created a single account for Phases I and III. The evidence shows that Stanley would have paid taxes in the amount of $104,478.28 to WFISD and $27,682.75 to Wichita County but these amounts are a combination of the taxes abated under Phases I and III. It is impossible to tell what personal property additions and improvements related only to Phase I and there is no evidence that all of the additions related to both Phases. We conclude that the evidence is legally insufficient to support an award of damages for the full amount of taxes abated under Phases I and III. To this extent, Issues Four and Five are sustained.

## ADDITIONAL OR AMENDED FINDINGS OF FACT

In the portion of its brief listing the issues presented by the appeal, Stanley includes a seventh issue which asks whether the trial court erred in failing to make Stanley's requested additional or amended findings of fact and conclusions of law. The brief does not include any argument or authorities in support of this issue. Consequently, we find that the issue has been waived because it has been inadequately briefed. *See* TEX.R.APP.P. 38.1(i); *Ashley Furniture Industries Inc. ex rel. RBLS Inc. v. Law Office of David Pierce*, 311 S.W.3d 595, 597 (Tex.App.--El Paso 2010, no pet.).

## ATTORNEY'S FEES

In its eighth issue, Stanley challenges the award of attorney's fees. First, Stanley asserts that WFISD is not entitled to any attorney's fees because it should take nothing on its breach of

contract claim. This argument is without merit because we have overruled Issues One through Three and we have concluded in Issues Four and Five that WFISD sustained its burden of proving that Stanley breached the Tax Abatement Agreement by failing to fully perform Phases I and II. Second, Stanley contends that the award of appellate attorney's fees is erroneous because the award is not conditioned on Stanley's appeal being unsuccessful. WFISD concedes that Stanley is correct regarding the award of appellate attorney's fees. Accordingly, we sustain this part of Issue Eight. *See A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 707 n.1 (Tex. 2007); *Gilbert v. City of El Paso*, 327 S.W.3d 332, 337 (Tex.App.--El Paso 2010, no pet.).

## DENIAL OF MOTION FOR SUMMARY JUDGMENT

In its final issue, Stanley contends that the trial court erred by denying its motion for summary judgment. Stanley acknowledges that this issue cannot be sustained under current Texas law. *See e.g., Horton v. Horton*, 965 S.W.2d 78, 88 (Tex.App.--Fort Worth 1998, no pet.)(stating rule that where a motion for summary judgment is denied by the trial judge and the case is tried on its merits, the order denying the motion for summary judgment is not reviewable on appeal); *Gem Homes, Inc. v. Contreras*, 861 S.W.2d 449, 453 (Tex.App.--El Paso 1993, writ denied)(same). Stanley states that it is raising the issue in good faith in order to preserve its contention that the Texas Supreme Court should overrule current law forbidding review of a trial court's order denying a motion for summary judgment after the case is tried on the merits. Issue Nine is overruled.

Having sustained Issues Four and Five in part, we reverse that portion of the judgment awarding WFISD damages in the amount of $220,087.54 and pre-judgment interest in the sum of $74,251.11. Having sustained Issue Eight in part, we reverse that portion of the judgment awarding appellate attorney's fees without making it contingent on an unsuccessful appeal by

- 18 -

Stanley. Having overruled the other issues, we affirm the remaining portion of the judgment. We remand the cause to the trial court for entry of judgment in accordance with this opinion.


April 25, 2012

_____
ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.