2025 Tex. Bus. 22



THE BUSINESS COURT OF TEXAS
EIGHTH DIVISION

| | | |
|---|---|---|
| SLANT OPERATING, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Cause No. 24-BC08A-0002 |
| | § | |
| OCTANE ENERGY OPERATING, LLC, | § | |
| | § | |
| *Defendant.* | § | |

## OPINION AND ORDER

### *Syllabus*[*]

*This opinion addresses whether the Plaintiff pleaded facts sufficient to establish subject-matter jurisdiction under Texas Government Code § 25A.004(d)(1) and whether the Defendant successfully challenged jurisdiction on the grounds of pleading insufficiency and existence of jurisdictional facts. The Court concludes that because the Plaintiff has pleaded sufficient jurisdictional allegations and the Defendant failed to successfully refute these allegations, the Court must deny Defendant's Plea to the Jurisdiction.*

---

[*] The syllabus was created by court staff and is provided for the convenience of the reader. It is not part of the Court's opinion, does not constitute the Court's official description or statement, and should not be relied upon as legal authority.

**OPINION**

¶ 1     Before the Court is Plaintiff Slant Operating, LLC's ("Slant") Objection to Dismissal for Lack of Jurisdiction and Supporting Brief filed on November 25, 2024 ("Dismissal Objection"), Defendant Octane Energy Operating, LLC's ("Octane") Response to Slant Operating LLC's Objection filed on December 5, 2024 ("Objection Response"), Octane's Plea to the Jurisdiction filed on April 4, 2025 ("Plea"), and Slant's Response in Opposition to Octane's Plea filed on May 2, 2025 ("Plea Response").  After considering the pleadings, the jurisdictional briefs and evidence, and the oral arguments presented by counsel, the Court concludes that Slant has sufficiently pleaded facts to support its claims that (1) the agreement at issue is a qualified transaction, and (2) that the Court has subject-matter jurisdiction over this action under Texas Government Code § 25A.004(d)(1).  Accordingly, the Court denies Octane's Plea.

## I.     RELEVANT BACKGROUND

### A.     Slant and Octane enter into a reciprocal waiver agreement.

¶ 2     Slant and Octane are entities involved in oil and gas exploration and production in several regions of the state.  Pl.'s Am. Pet. ¶ 20.  As part of their business operations, both entities operate oil and gas wells.  *Id.*  On February 22, 2023, Slant and Octane entered into a letter agreement whereby each entity agreed to a reciprocal waiver of any objections they had to the other's "off-lease penetration point" permit applications ("Letter Agreement").  *Id.* ¶¶ 27–29; Pl.'s Am. Pet., Ex. 1.  More specifically, Slant agreed to waive its right to protest Octane's permit application to drill Octane's Green Gables

Wells from a penetration point on Slant's leasehold.  Pl.'s Am. Pet. ¶ 29.  In turn, Octane agreed to "waive its right to protest future Slant drilling permit applications insofar . . . as they concern Off Lease Penetration Points where Octane is the offset operator of record." *Id.*  In addition to exchanging waivers, the parties also agreed to provide each other with "daily drilling, completion, and flowback reports for each of the [w]ells" and "[d]aily production data for each of the [w]ells."  Pl.'s Am. Pet., Ex. 1.  The Letter Agreement made no mention of monetary consideration; any obligations that one party had to pay or advance money to the other; the monetary value each party placed on the waivers, the production data and reports, or the agreement as a whole; or the revenue each party expected to receive following the issuance of the drilling permits by the Texas Railroad Commission ("RRC").

¶ 3  Slant alleges that following the execution of the Letter Agreement it "fully performed its obligation" by waiving objections to Octane's plan to drill the five Green Gables Wells from a penetration point on Slant's leasehold.  Pl.'s Am. Pet. ¶ 30.

¶ 4  Less than 18 months after the Letter Agreement was signed, Slant sought to drill its Gardendale Wells from an off-lease penetration point on Octane's leasehold.  *Id.* From June to August 2024, Slant and Octane discussed a possible waiver of Octane's right to object to Slant's application to drill the Gardendale Wells.  *Id.* ¶¶ 32–34; Pl.'s Am. Pet., Exs. 2–3.  After Slant formally requested the waiver, Octane ultimately informed Slant that it would not provide the waiver.  Pl.'s Am. Pet. ¶ 35; Pl.'s Am. Pet., Exs. 4–5.  On September 16, 2024, after Slant submitted its permit application to the RRC without the waiver,

Octane sent an official objection to the application to Slant and the RRC. Pl.'s Am. Pet. ¶ 37.

**B.      Slant files suit against Octane in a Tarrant County district court.**

¶ 5      On August 12, 2024, Slant filed an original petition in the 48th Judicial District Court in Tarrant County. In its petition, Slant alleged that Octane breached the Letter Agreement by refusing to provide the requested Gardendale Wells waiver, causing Slant to lose at least $11.8 million in expected revenue.

¶ 6      On September 23, 2024, Octane filed a motion to transfer venue and an original answer, arguing that the case should be transferred to Midland County. On October 1, Slant filed a response in opposition to Octane's motion to transfer venue. That same day, Slant nonsuited its claim against Octane.

**C.      Slant commences suit in the Business Court.**

¶ 7      On October 1, 2024, Slant filed its Original Petition in the Business Court of Texas ("Business Court" or "Court"), bringing a breach-of-contract claim. In the petition, Slant generally alleged that this Court has subject-matter jurisdiction over the action under Texas Government Code § 25A.004(d)(1) because it arose out of a qualified transaction and the amount in controversy is over $10 million.

¶ 8      On November 15, 2024, after reviewing the Original Petition, the Court ordered jurisdictional briefing explaining (1) how the agreement at issue is a qualified transaction under Texas Government Code § 25A.004(d)(1) sufficient to invoke the Court's

authority to hear the case and (2) whether the case should be dismissed or transferred under § 25A.006(b) in the event the Court lacks authority.

¶ 9    On November 25, 2024, Slant filed its Dismissal Objection, arguing that Octane's promise to waive objections to all future off-lease drillings was a qualified transaction worth over $10 million. Slant also requested a dismissal without prejudice in the event the Court finds it lacks jurisdiction. On December 5, Octane filed its Objection Response. Octane argued that this case should be dismissed for lack of jurisdiction because the Letter Agreement lacks material terms that would show that it is a qualified transaction. On January 7, 2025, the Court held a hearing where the parties presented their arguments for and against dismissal.

¶ 10    On January 17, 2025, after making a preliminary determination that the Original Petition failed to plead facts sufficient to establish the Court's jurisdiction, the Court issued an order allowing Slant the opportunity to amend its petition and for the parties to conduct jurisdictional discovery. On January 31, Slant filed its Amended Petition. On April 4, Octane filed its Plea, formally asking the Court to dismiss the case for lack of jurisdiction. Slant filed its Plea Response on May 2. The Court heard arguments pertaining to the Plea on May 7.

## II.    LEGAL STANDARDS

¶ 11    "[S]ubject-matter jurisdiction is essential to a court's power to decide a case." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000). Whether subject-matter jurisdiction exists is a question of law. *City of Houston v. Rhule*, 417 S.W.3d

440, 442 (Tex. 2013) (per curiam).  To establish jurisdiction, the plaintiff must plead facts sufficient to "affirmatively demonstrate the court's jurisdiction to hear the cause."  *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex. 1993); *see also* TEX. R. CIV. P. 354(a) ("For an action originally filed in the business court, an original pleading that sets forth a claim for relief . . . must . . . plead facts to establish the business court's authority to hear the action.").

¶ 12    When a plea to the jurisdiction attacks the pleadings, courts typically construe the pleadings liberally in favor of the plaintiff and consider the plaintiff's intent. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).  "If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court[']s jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff[] should be afforded the opportunity to amend."  *Id.* at 226–27.  However, "[i]f the pleadings affirmatively negate . . . jurisdiction," the case may be dismissed without providing an opportunity to amend.  *Id.* at 227.

¶ 13    On the other hand, when a plea to the jurisdiction attacks the existence of jurisdictional facts, courts are required to consider relevant evidence "when necessary to resolve the jurisdictional issues raised," even if the evidence implicates the merits.  *Id.*; *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018).  When a defendant attacks the existence of jurisdictional facts in a plea to the jurisdiction, the Texas Supreme Court has described the process of analyzing and resolving the plea as one that "generally mirrors that of a summary judgment."  *City of Austin v. Powell*, 704 S.W.3d 437,

446 (Tex. 2024) (citing *Miranda*, 133 S.W.3d at 226). If the plea challenges a plaintiff's factual allegations with supporting evidence that refutes jurisdiction, the burden then shifts to the plaintiff to raise a genuine issue of material fact to defeat the jurisdictional challenge. *Miranda*, 133 S.W.3d at 221; *C Ten 31 LLC ex rel. Summer Moon Holdings LLC v. Tarbox*, 2025 Tex. Bus. 1, ¶ 44, 708 S.W.3d 223, 241 (3rd Div.). The plea to the jurisdiction may also take on the character of a no-evidence motion for summary judgment by asserting that the plaintiff has produced no evidence to establish jurisdiction. *See Powell*, 704 S.W.3d at 447. In such a case, the plaintiff must produce enough evidence to raise a genuine issue of material fact to survive the plea. *See id.* at 448; *Miranda*, 133 S.W.3d at 227–28; *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 551–52 (Tex. 2019) (providing that nonmovant raises fact issue by producing "more than a scintilla of evidence"). Or, as the Supreme Court stated in *Powell*, the plea "may be like a hybrid motion for summary judgment where both parties attach evidence," in which case the "'ultimate issue' in that instance is likewise 'whether the nonmovant raised a fact issue to preclude summary judgment.'" *Powell*, 704 S.W.3d at 448 (citing *Fossil Grp., Inc. v. Harris*, 691 S.W.3d 874, 882 (Tex. 2024)). "If the evidence raises a fact question as to the court's jurisdiction, then the trial court may not grant the plea." *Id.* (citing *Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 116 (Tex. 2010)). Instead, the fact issue must be resolved by the fact finder. *See Miranda*, 133 S.W.3d at 227–28. If a fact issue is not raised, or if the evidence is undisputed, the court can rule on the plea as a matter of law. *Id.* at 228.

¶ 14    If the evidence implicates the merits of the case, the court must take all evidence favorable to the plaintiff as true and "indulge every reasonable inference and resolve any doubts in the [plaintiff's] favor." *See Miranda*, 133 S.W.3d at 228; *Christ v. Tex. Dep't of Transp.*, 664 S.W.3d 82, 89 (Tex. 2023).

### III.    ANALYSIS

**A.    At its core, whether the Court has subject-matter jurisdiction is an issue of statutory construction.**

¶ 15    To determine whether the Business Court has jurisdiction over this case, the Court must construe Texas Government Code §§ 25A.001(14) and 25A.004(d)(1). Statutory construction is a question of law. *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017). The goal of statutory construction is to ascertain and effectuate legislative intent. *Id.* Legislative intent is expressed in the plain and common meaning of the statutory text "unless a different meaning is supplied, is apparent from the context, or the plain meaning of the words leads to absurd or nonsensical results." *Id.* In construing a statute's plain meaning, the words and phrases are considered in the context of the entire statute and construed according to the rules of grammar and usage. *Id.* at 325–26. Courts presume that the legislature chose the statutory text "with care, including each word chosen for a purpose, while purposefully omitting words not chosen." *Id.* Definitions prescribed by the legislature are used when construing a statute. *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 511 (Tex. 2012).

¶ 16    Section 25A.004 of the Texas Government Code sets forth the types of cases the Business Court has the authority to hear. Pursuant to the statute, the Business Court

has jurisdiction over cases with an amount in controversy exceeding $10 million and arising out of a qualified transaction. TEX. GOV'T CODE § 25A.004(d)(1). The legislature defined "qualified transaction":

> "Qualified transaction" means a transaction, other than a transaction involving a loan or an advance of money or credit by a bank, credit union, or savings and loan institution, under which a party:
>
> > (A) pays or receives, or is obligated to pay or is entitled to receive, consideration with an aggregate value of at least $10 million; or
> >
> > (B) lends, advances, borrows, receives, is obligated to lend or advance, or is entitled to borrow or receive money or credit with an aggregate value of at least $10 million.

*Id.* § 25A.001(14).

¶ 17    As an initial matter, § 25A.004(d)(1) includes two requirements for jurisdiction: (1) the amount in controversy is over $10 million; and (2) the action arises out of qualified transaction, which is supported by consideration worth at least $10 million. *Id.* § 25A.004(d)(1). The amount in controversy is not the same as consideration. *See Goosehead Ins. Agency v. Williams Ins. & Consulting*, 533 F. Supp. 3d 367, 376 n.2 (N.D. Tex. 2020)[1]; *Amount in Controversy*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The damages claimed or relief demanded by the injured party in a lawsuit."); *Consideration*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Something (such as an act, a forbearance, or a

---

[1] The *Goosehead* case analyzes the meaning of "qualified transaction" in the Texas Business and Commerce Code, which is defined in substantially similar terms as that in Texas Government Code § 25A.004(d)(1). The court concluded that the legislature's use of "obligation" in the Business and Commerce Code definition "refer[s] to the contractual consideration between all parties in the transaction, as opposed to . . . the amount in controversy at the time of litigation." *Goosehead*, 533 F. Supp. 3d at 376 n.2.

return promise) bargained for and received by a promisor from a promisee; that which motivates a person to do something, esp. to engage in a legal act."). Consequently, not every commercial dispute with an amount in controversy of over $10 million will arise under a qualified transaction and confer jurisdiction on the Business Court.

¶ 18    As Slant correctly stated in its Dismissal Objection, "[t]he principal question is whether the statutory requirement of consideration with an aggregate value of at least $10 million has been satisfied."  Pl.'s Dismissal Obj. at 10 (internal quotation marks omitted).  It is not whether the $10 million amount-in-controversy requirement has been met.  The parties disagree as to whether the Letter Agreement constitutes a qualified transaction supported by consideration worth at least $10 million and whether the amount in controversy is indeed more than $10 million.  However, a resolution of those disputes is best left for another day.  Under Texas's liberal pleading standard, for purposes of determining jurisdiction, the Court finds that Slant's Amended Petition contains sufficient facts to satisfy the $10-million amount-in-controversy requirement.  *See* Pl.'s Am. Pet. ¶¶ 38–41.  Further, for the reasons below, the Court also finds that Slant has pleaded facts sufficient to support its claim that the parties were entitled to receive at least $10 million in aggregate consideration under the Letter Agreement.

**B.    Slant's pleadings and factual allegations overcome Octane's jurisdictional challenges.**

In its Plea, Octane challenges both the pleadings and the existence of jurisdictional facts as bases for the Court's lack of jurisdiction over the case.  The Court will examine both challenges in turn.

### 1. Challenge to Pleadings

¶ 19  In its Plea, Octane argues that Slant has not pleaded sufficient facts alleging that Slant was entitled to receive over $10 million in consideration at the time of contracting.  Def.'s Plea at 4.  Octane distinguishes what Slant "expected to receive" from what it was "entitled to receive."  *Id.* at 5.  Additionally, Octane argues that Slant did not affirmatively show how the parties valued Slant's waiver associated with the Green Gables drilling, which Slant also uses to argue that the Letter Agreement is a qualified transaction.  *Id.*  In accordance with Texas's liberal pleading standard, the Court finds that Slant has pleaded enough facts to support its claim that the Letter Agreement is a qualified transaction under Texas Government Code Chapter 25A.

¶ 20  In its Amended Petition, Slant alleges that the value of the waivers (i.e., the consideration) was "the value of the additional oil and gas that both Slant and Octane expected to receive as a result of the increased productive lateral length that drilling at an off-lease penetration point provided."  Pl.'s Am. Pet. ¶ 13.  Slant also alleges that, at the time of contracting, "Slant knew that the receipt of Octane's waiver would increase the productive lateral length of Slant's future wells by an estimated 515 feet per well," which would allow for over 33,000 additional feet of productive lateral length over an estimated 65 wells.  *Id.* ¶ 14.  Slant asserts that it expected to produce at least an additional 2.6 million barrels of oil, 2.9 billion cubic feet of natural gas, and 305,000 barrels of natural gas liquids based on Octane's promise to waive objections.  *Id.* ¶ 15.  Slant, therefore, valued Octane's promised waivers at about $130 million at the time of contracting.  *Id.*

¶ 21    As for the value of the Gardendale Wells waiver specifically, the drilling of which is the crux of Slant's alleged damage amount, Slant further alleges that it expected to produce an additional 41,200 barrels of oil, 44,800,000 cubic feet of natural gas, and 4,700 barrels of natural gas liquids at the time of contracting, which was valued at over $11.5 million.  *Id.* ¶ 16; *see id.* ¶¶ 38, 41.  Regarding the value of Slant's waiver for the Green Gables drilling, Slant alleged that the waiver "similarly allowed Octane to increase its productive lateral length for the wells," and Octane's consideration at the time of contracting was also over $10 million.  *Id.* ¶ 18.

¶ 22    Based on the foregoing factual allegations, Slant has satisfied the pleading standard set forth in Texas Rule of Civil Procedure 354(a) and *Miranda* and has successfully pleaded the Court's authority to hear the case under Texas Government Code § 25A.004(d)(1).

¶ 23    In arguing that Slant's jurisdictional allegations provided no indication of what consideration it was entitled to receive at execution, Octane cites an Austin Court of Appeals opinion.  Def.'s Plea at 5 n.3 (citing *Hughes v. Pearcy*, No. 03-10-00319-CV, 2014 WL 7014353, at *3 (Tex. App.—Austin Dec. 8, 2014, pet. denied) (mem. op.)).  In *Hughes*, Pearcy contracted with Hughes to sell his business, PPI, to Hughes.  *Hughes*, 2014 WL 7014353, at *1.  Pearcy also agreed to grant PPI the exclusive rights to certain microbial formulations for five years in exchange for royalties.  *Id.*  Per the licensing agreement, the royalty payments were 14 percent of the business's net sales up to $189,000 per year.  *Id.* at *1, 3. Once the five-year period was over, PPI had the option to purchase the formulations

for $100,000; PPI could also accelerate this purchase option if the maximum unpaid royalties remaining under the agreement and the formulation purchase price were paid. *Id.* at *1. Pearcy alleged that Hughes accelerated PPI's purchase option, but PPI refused to pay the remaining unpaid royalties and the formulation purchase price despite Pearcy providing Hughes with the formulations. *Id.*

¶ 24    During the litigation, there was a dispute regarding venue. *Id.* at *2. To resolve the venue question, the court analyzed whether the mandatory venue provision in Texas Civil Practice and Remedies Code § 15.020 for major transactions applied. *Id.* A "major transaction" is "[a] transaction evidenced by a written agreement under which a person pays or receives, or is obligated to pay or entitled to receive, consideration with an aggregate *stated* value equal to or greater than $1 million." TEX. CIV. PRAC. & REM. CODE § 15.020(a) (emphasis added). The transaction underlying the suit was made up of four separate contracts, including the licensing agreement. *Hughes*, 2014 WL 7014353, at *3. After determining that the other three contracts expressly entitled Pearcy to $500,000, the court ultimately determined that the transaction was not a major transaction because of the licensing agreement. *See id.* Because the royalty payments under the licensing agreement were "contingent upon PPI's future sales and PPI electing to purchase the formulations at a later date," the court could not conclude that the agreement obligated Pearcy to the remaining $500,000 needed to make the transaction a major transaction. *Id.* The court stated, "On the face of this agreement, PPI may never have been obligated to pay any sum as consideration because all payments are conditioned on future, uncertain net sales and

the Appellants electing to exercise their option to purchase Pearcy's formulations at a future date." *Id.*

¶ 25    Setting aside that *Hughes* focuses on major transactions and does not address pleadings challenges under pleas to the jurisdiction, even if *Hughes* applied to deem what Slant was entitled to receive under the Letter Agreement too uncertain, Slant also alleged that its promise to provide a waiver for Octane's Green Gables Wells (what Octane was entitled to receive) was worth at least $10 million. *See* Pl.'s Am. Pet. ¶ 18. Therefore, the value of consideration for that promise alone would have made the Letter Agreement a qualified transaction. Additionally, the Court must consider Slant's intent and construe its allegations liberally in its favor. *See Miranda*, 133 S.W.3d at 226. Doing so makes Slant's allegations sufficient to overcome this jurisdictional challenge.

¶ 26    Further, the *Hughes* court cited *In re Texas Association of School Boards*, 169 S.W.3d 653 (Tex. 2005), for support of its conclusion. *Hughes*, 2014 WL 7014353, at *3. But, in that case, the Supreme Court of Texas found that an insurance agreement was not a major transaction because the consideration's aggregate stated value was the insurance premiums paid, not the insurance limits. *See In re Tex. Ass'n of Sch. Bds.*, 169 S.W.3d at 658. This was because an insurance agreement is an aleatory contact—"a contract in which a promise is conditioned on the happening of a fortuitous event, an event of chance"—and the consideration for such an agreement is the premiums that covers a party's assumption of the risk that a fortuitous event will occur. *Id.* at 658–59. The Letter Agreement cannot be categorized as an aleatory contract, as the obligations of the parties

were not conditioned on events of chance. And the parties did not assume the risk of certain events occurring. Instead, each party assumed obligations to provide waivers upon request and production data once the wells were drilled. *See Spin Dr. Golf, Inc. v. Paymentech, L.P.*, 296 S.W.3d 354, 359 (Tex. App.—Dallas 2009, pet. denied) (contrasting assumption of risk from assumption of obligation under contract). In short, the consideration each party was entitled to under the Letter Agreement was not contingent on future events of chance. While future fortuitous events could impact the value ultimately derived from that consideration (i.e., revenue), the relevant inquiry here is the value of the consideration at the time of contracting. *See Atlas IDF, LP v. NexPoint Real Est. Partners, LLC*, 2025 Tex. Bus. 16, ¶ 33, --- S.W.3d ----, 2025 WL 1381574, at *4 (1st Div.).

¶ 27    Accordingly, the Court deems Octane's pleadings challenge unsuccessful.

### 2. Challenge to Jurisdictional Facts

#### a. *Octane failed to successfully refute the existence of jurisdictional facts.*

¶ 28    With its Plea, Octane produced several exhibits in an attempt to refute Slant's jurisdictional allegations that the Letter Agreement entitled Slant and Octane to receive at least $10 million in consideration at the time of contracting. Octane also argued that Slant failed to produce evidence supporting these allegations. In accordance with *Miranda* and *Powell*, the Court concludes that (1) the evidence presented by Octane fails to refute Slant's assertion that the Letter Agreement is a qualified transaction for purposes of conferring jurisdiction on the Court and (2) Slant has produced evidence sufficient to survive Octane's no-evidence argument.

### i.   The Letter Agreement

¶ 29   Octane argues that the Letter Agreement itself refutes jurisdiction because (1) it is silent about the value of Octane's waivers for future drilling permits, (2) "Slant cannot alter the Letter Agreement's stated consideration with allegations," and (3) Slant was not entitled to receive consideration over $10 million at the time of contracting because Octane's promise to waive objections to future permit applications is an unenforceable agreement to agree with no value.  Def.'s Plea at 6–7.

¶ 30   First, while including a dollar amount would have been helpful to determining the value of consideration, a recital of consideration is not required to be included in a written contract.  *See Gooch v. Am. Sling Co.*, 902 S.W.2d 181, 185 (Tex. App.—Fort Worth 1995, no writ) (citing *Wright v. Robert & St. John Motor Co.*, 58 S.W.2d 67, 69 (Tex. [Comm'n Op.] 1933) (explaining that a written contract presumes consideration and that the burden is on the defendant to prove want of consideration).  Also, as argued by Slant, there is no language in Texas Government Code Chapter 25A that requires that the value of consideration be stated in the contract.  *See* Def.'s Plea Resp. at 4. *Compare* TEX. GOV'T CODE § 25A.001(14) (definition of "qualified transaction" providing for "aggregate value"), *with* TEX. CIV. PRAC. & REM. CODE § 15.020(a) (definition of "major transaction" providing for "aggregate stated value").  Therefore, the fact that the Letter Agreement does not state the monetary value of Octane's future waivers does not mean the contract itself refutes Slant's allegation that the waivers were worth at least $10 million.

¶ 31    Second, the Court does not believe that Slant's jurisdictional allegations alter the Letter Agreement's "stated consideration."  Consideration is an exchange of promises bargained for by the parties to a contract.  *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991).  Consideration "consists of either a benefit to the promisor or a detriment to the promisee."  *Id.*  The aggregate value of the consideration used to support a qualified transaction is determined at the time of contracting.  *See Atlas IDF*, 2025 Tex. Bus. 16, ¶ 33, 2025 WL 1381574, at *4 (citing *Goosehead*, 533 F. Supp. 3d at 376, 380).

¶ 32    The consideration that each party was entitled to receive is apparent from the Letter Agreement.  The agreement consists of two provisions, one pertaining to the drilling of Octane's Green Gables Wells and the other pertaining to the future drillings of Slant wells:

Mr. Blong,

This Letter Agreement ("Agreement") by and between Slant Operating, LLC ("Slant") and Octane Energy Operating, LLC ("Octane") shall serve as a mutually agreeable understanding regarding Octane's drilling permit applications for the Green Gables 1102 #1LS, #2WA, #3LS, #4WA, and #5LS Wells (the "Wells"), and Slant's waiver of its right to protest Octane's drilling permit applications insofar as they pertain to Off Lease Penetration Points for each of the Wells pursuant to Statewide Rule 86.

In exchange for Slant waiving its right to protest the above referenced drilling permit applications insofar and only insofar as they pertain to Off Lease Penetration Points for each of the Wells, Octane agrees to provide Slant the following:

1. Daily drilling, completion, and flowback reports for each of the Wells.

2. Daily production data for each the Wells, provided monthly.

Upon execution hereof, Slant formally agrees that it will waive, in writing, its right to protest Octane's permit applications for the Wells.

Furthermore, Octane agrees to waive its right to protest future Slant drilling permit applications insofar and only insofar as they concern Off Lease Penetration Points where Octane is the offset operator of record. In exchange for any such waiver, Slant would agree to provide to Octane the same data requested in Paragraphs 1 and 2 above.

In witness thereof, both parties have executed and made effective this Agreement as of the Effective Date set forth above.

**Slant Operating, LLC**

By: Sean P. Gill
Its: EVP – Land and Business Development

**Octane Energy Operating, LLC**

By: Jared N. Blong
Its: Manager

Def.'s Plea, Ex. C. Slant alleges that its promise to provide a waiver for the Green Gables Wells and Octane's promise to provide future waivers for Slant's wells entitled each party to consideration with an aggregate value of at least $10 million at the time of contracting. Slant's attempt to place a dollar value on those promises does not alter the consideration set forth in the Letter Agreement.

¶ 33    Lastly, even if Octane's promise to provide future waivers is an unenforceable agreement to agree with no value, this does not refute the allegation Slant's promise to provide a waiver for the Green Gables Wells to Octane was worth at least $10 million at the time of contracting, which provides an independent basis for concluding that the Letter

Agreement is a qualified transaction. Therefore, the Court does not believe that considering the enforceability of Octane's future waiver promise is necessary for the jurisdictional analysis.

¶ 34   In addressing Slant's allegation that the Green Gables waiver provision provided an independent basis for jurisdiction, Octane argued at the May 7, 2025 hearing that the Letter Agreement is divisible, making each provision separate contracts. Therefore, Octane asserted that any value Slant placed on the future waiver provision cannot be placed on the Green Gables waiver provision to establish jurisdiction. Additionally, according to Octane, interpreting the Letter Agreement as divisible will further show a lack of jurisdiction, as the future waiver provision is an unenforceable agreement to agree and the action does not arise out of the Green Gables waiver provision.

¶ 35   In support of these arguments, Octane referenced *Stanley Works v. Wichita Falls Independent School District*, 366 S.W.3d 816 (Tex. App.—El Paso 2012, pet. denied). In this case, Stanley Works and Wichita County, Texas entered into a tax abatement agreement, whereby Stanley Works would make personal property additions and improvements to its Wichita Falls, Texas tool manufacturing facility. *Stanley Works*, 366 S.W.3d at 820. The work was to occur in three separate phases—Phase I, Phase II, and Phase III—and was detailed in the agreement. *Id.* at 820–21. Under the agreement, the county would give Stanley Works declining ad valorem tax abatements on these additions and improvements. *Id.* at 821. If Stanley Works failed to complete the work for each phase, the agreement provided that the company would have to repay all property tax revenue the

county lost related to the additions and improvements. *Id.* Wichita Falls Independent School District ("WFISD") was also a party to the agreement. *Id.* at 820. WFISD sued Stanley Works, alleging that the company did not make all the required additions and improvements to the Wichita Falls facility and failed to repay the county's lost property tax revenue. *Id.* at 822. The trial court ruled in WFISD's favor, and Stanley Works appealed. *Id.*

¶ 36    On appeal, Stanley Works argued that the agreement was a divisible contract separated into three parts: Phases I, II, and III. *Id.* at 826, 827. The appellate court relied on principles of contractual construction to determine whether the agreement was divisible. *Id.* at 826. "In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself," which requires examination of the whole contract to harmonize and effectuate every provision and avoid rendering any provision meaningless. *Id.* Whether a contract is divisible involves consideration of the parties' intent and conduct and the agreement's subject matter. *Id.* at 827. "If there is a single assent to a whole transaction involving several things, a contract is entire, but if there is a separate assent to each of the several things involved, it is divisible." *Id.* Further, "[a] contract is divisible when the performance by one party consists of several distinct and separate items and the price paid by the other party is apportioned to each item." *Id.*

¶ 37    The court concluded that the tax abatement agreement's express language showed the parties' intent to create a divisible contract. *Id.* at 828. Section 4.4 of the agreement provided the following:

> If [Stanley] fails to make the personal property additions and improvements to the Premises which are described in this Agreement as Phase I, II, or III, respectively, [Stanley] shall repay all property tax revenue lost by the County as a result of this Agreement insofar as such lost tax revenue relates to the additions and improvements described in the particular Phase, subject to any and all lawful offsets, settlements, deductions or credits to which [Stanley] may otherwise be entitled; provided, however, the failure to make the additions and improvements in any particular Phase shall not adversely affect the tax abatement provided for herein with respect to any other Phase.

*Id.* at 827 (alteration in original). Because the language "plainly contemplate[d]" that specific additions and improvements were assigned to specific phases and the failure to complete one phase would not affect the tax abatement provided for another, the court concluded that the parties intended the contract be divisible. *Id.* at 827–28. Any other interpretation of Section 4.4 would render it meaningless. *Id.* at 828.

¶ 38    The case at bar is distinguishable from *Stanley Works*. The Letter Agreement does not contain any express language similar to Section 4.4. There is no language that expressly divides performance by each party into separate phases or parts. And there is no language that expressly states that the failure of one party to perform under one provision will not limit that party's right to receive the waivers or data it contracted for in the other provision. Additionally, the Letter Agreement contains a single assent (i.e., the parties' signatures at the end of the agreement), evidencing a non-divisible contract. *See id.* at 826. Therefore, the Court is not persuaded by Octane's divisibility argument.

### ii.    Contract Negotiations

¶ 39    Octane argues that the documents evidencing the parties' negotiations show there was no mention of the future waiver provision, as "Slant was interested in a waiver-

for-data exchange—not the waiver-for-waiver deal, that Slant now alleges as a basis for this Court's jurisdiction." Def.'s Plea at 9.

¶ 40    These documents consist of an email thread between Octane's Jared Blong and Slant's Sean Gill from February 2023 where the parties negotiated the Letter Agreement. Def.'s Plea, Ex. B. The emails indicate that Blong sent a draft of the Green Gables Wells waiver the parties discussed via text to Gill on February 6, 2023. On February 15, Gill responded that Slant would be "open to granting the waiver in exchange for drilling, completion, flowback and production data for the wells being drilled." On February 20, Blong indicated that Octane revised the waiver and asked that it be turned around quickly for submission to the RRC. On February 22, Gill indicated that he sent Blong the Letter Agreement "to document the exchange further." On February 23, Blong sent Gill the executed Letter Agreement and asked for Gill to sign it as well. The same day, Gill sent the final Letter Agreement signed by both parties and the signed Green Gables waiver.

¶ 41    This email thread does not refute Slant's jurisdictional allegations. The Court acknowledges that there is no mention of an agreement that Octane would provide waivers for future Slant drilling applications *anywhere* in the email thread. However, the absence of discussion regarding that provision in the thread does not mean that Slant was not interested in a "waiver-for-waiver deal"; in fact, Blong sending Gill the Letter Agreement that included the future waiver provision suggests that Slant was interested in such an agreement during negotiations. And nothing in the email thread refutes Slant's allegation that its Green Gables Wells waiver and Octane's future waivers entitled the

parties to consideration with an aggregate value of at least $10 million at the time of contracting. As such, this exhibit also fails to refute jurisdiction.

### iii. Slant's Post Hoc Valuation of the Green Gables Wells Waiver

¶ 42 Octane also produced an email thread from January 2025 in which Slant personnel attempted to calculate the value of Slant's agreement to provide a waiver for Octane's Green Gable Wells. Def.'s Plea, Ex. F.

¶ 43 While Slant was not in the position to accurately calculate this figure (as it pertained to Octane's wells), Slant's attempt to do so does not refute its allegation that was Octane was entitled to receive at least $10 million in aggregate consideration under the Letter Agreement. An attempt to create a detailed calculation of the value of consideration after the fact does not refute that that value met the jurisdictional threshold. As Slant argues, while the *Goosehead* court found that a party's projections created before entering a franchise agreement satisfied the $1 million aggregate-consideration threshold, the court did not adopt a rule stating that such evidence must have existed at the time of contracting. *See Goosehead*, 533 F. Supp. 3d 367 at 380; Pl.'s Plea Resp. at 9. And this Court is unaware of any case that has established such a rule. Therefore, the Court refuses to create such a rule at this time.

### iv. Slant's Jurisdictional Discovery Responses

¶ 44 In the section of Octane's argument titled "Slant's discovery responses do not support and undermine its jurisdictional allegations," Octane argues that Slant's discovery responses refute jurisdiction because (1) Slant's interrogatory responses stating

that it valued Octane's future waivers at about $130 million at the time of contracting were unsupported and (2) Slant produced no evidence, such as projections created during contract negotiation, of its valuation of the future Octane waivers. Def.'s Plea at 8; *see* Def.'s Plea, Ex. D.

¶ 45 Courts review the substance of pleadings and motions to determine the proper characterization of them. *Powell*, 704 S.W.3d at 448. In substance, Octane's argument that Slant has not produced evidence supporting its jurisdictional allegations mirrors a no-evidence motion for summary judgment. *See* Def.'s Plea at 8–9 ("Slant, however, has produced no *evidence* that [the allegations set forth in its interrogatory responses] are actually true; that is, Slant has no 'projections' it created during negotiations about how it valued Octane's waiver."). Therefore, the Court's analysis of this argument will be akin to the no-evidence summary judgment standard. *See Powell*, 704 S.W.3d at 447. Once Octane put forth its no-evidence argument, Slant was required to present more than a scintilla of evidence to create a genuine issue of material fact regarding jurisdiction and overcome the challenge. *See Swanson*, 590 S.W.3d at 551. Slant did just that by filing supporting evidence, including uncontroverted expert declarations. Pl.'s Plea Resp., Exs. 1–2; *see* Pl.'s Plea Resp. at 14–15. Slant has therefore overcome Octane's no-evidence challenge to

jurisdiction, making denial of the Plea on that basis appropriate.[2] *See Swanson*, 590 S.W.3d at 551–52.[3]

>    b. *Because Octane did not successfully refute the existence of jurisdictional facts, the Court must deny the Plea.*

¶ 46    Because Octane has failed to produce evidence refuting Slant's jurisdictional allegation that both parties were entitled to receive consideration with an aggregate value of at least $10 million at the time of contracting, the Court must deny Octane's Plea. *Miranda*, 133 S.W.3d at 221.  Furthermore, because Slant was able to overcome Octane's no-evidence argument by producing more than a scintilla of evidence supporting its jurisdictional allegations, denial of the Plea at this stage is appropriate.  *See Swanson*, 590 S.W.3d at 551–52.

## IV.    CONCLUSION

¶ 47    The parties dispute Slant's alleged damages and whether the Letter Agreement entitles either party to receive consideration with an aggregate value of at least

---

[2] Even if Octane's argument in this subsection is analyzed under the traditional summary judgment standard, the Court finds that Octane has not satisfied its burden of presenting evidence refuting jurisdiction.  *See Miranda*, 133 S.W.3d at 221; *C Ten*, 2025 Tex. Bus. 1, ¶ 44, 708 S.W.3d at 241.  As the Court has already concluded, Slant sufficiently alleged that the parties were each entitled to receive consideration with an aggregate value of at least $10 million at the time of contracting.  Slant's "vague" discovery responses and failure to produce evidence of projections created at the time of contracting is not evidence that refutes jurisdiction.

[3] In arguing that Slant should have produced evidence of valuation, Octane also produced an email thread showing Slant's Gardendale Wells waiver request to Octane.  Def.'s Plea, Ex. G.  Octane appears to argue that because Slant did not request the waiver until over a year after the Letter Agreement was executed, that is evidence that Slant cannot prove the value it placed on the waiver at execution.  Under either summary judgment-like standard, Octane's argument is defeated.  Under a no-evidence standard, Slant's expert declarations provide more than a scintilla of evidence supporting jurisdiction.  Under a traditional standard, producing documents showing that Slant did not request the waiver until July 2024 does not refute the allegation that Slant was entitled to receive at least $10 million in consideration at the time of contracting.

$10 million.  While the Court makes no final determination regarding whether the amount in controversy is over $10 million or whether the Letter Agreement is indeed a qualified transaction, the Court concludes that (1) Slant has sufficiently pleaded facts to establish these jurisdictional requirements under Texas Government Code § 25A.004 and (2) Octane has failed to successfully challenge Slant's pleadings and the existence of jurisdictional facts.

¶ 48   Consistent with this opinion, the Court **DENIES** Defendant's Plea to the Jurisdiction.

**IT IS SO ORDERED.**

JERRY D. BULLARD
Judge of the Texas Business Court,
Eighth Division

SIGNED ON: May 23, 2025