2026 Tex. Bus. 21



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| JEAN CHRISTINE THOMPSON and THOMPSON PETROLEUM CORPORATION, *Plaintiffs*<br><br>v.<br><br>ANCHOR CAPITAL GP LLC and MICHAEL MANN, *Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Cause No. 25-BC01B-0038 |

## MEMORANDUM OPINION AND ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

[¶ 1]   This case is about whether defendants breached various contract duties owed to plaintiffs under a promissory note, security agreement, and employment agreement.  Before the court is Plaintiffs' Motion for Partial Summary Judgment.  The court considered the parties' submissions and oral arguments.

[¶ 2]   The pivotal issues are (i) the meaning of the phrase "books and records" in the Note and Security Agreement; (ii) whether Mann's alleged

unauthorized investments caused a remediable injury; and (iii) whether Thompson waived the Employment Agreement's nonwaiver clause and written prior approval requirement.

[¶ 3]   First, the phrase "books and records" is an undefined term. After applying the applicable law and contract construction principles to the undisputed facts, the court concludes that the phrase "books and records relating to the Collateral" broadly encompasses documents related to the Collateral's carried interests' values.

[¶ 4]   Second, contract breach claims require some remediable injury. After reviewing the presented evidence, the court concludes that plaintiffs failed to conclusively prove that Mann's alleged unauthorized conduct caused a remediable injury.

[¶ 5]   Third, the court concludes that Mann did not raise a genuine issue of material fact showing that Thompson waived the Employment Agreement's nonwaiver clause.  Thus, Thompson Petroleum Corporation conclusively proved that it had a for-cause basis to fire Mann.

[¶ 6] Accordingly,   the   court   denies-in-part   and   grants-in-part plaintiffs' motion.

## I.   BACKGROUND

### A. Factual Background[1]

#### 1.  The Parties

[¶ 7]   Jean Thompson is an owner and President of Thompson Petroleum Corporation (TPC).[2]

[¶ 8]   TPC is a family business that manages the Thompson family's assets and employs the J. Cleo Thompson Family Office's personnel.[3]

[¶ 9]   Michael Mann is the founder and CEO of defendant Anchor Capital GP LLC, a private equity investment brokerage comprised of Anchor and various subsidiaries.[4]

[¶ 10]   Christy 2017, LP is a holding company for the Thompson family's investments.  Christy 2017 is not a named party in this case, but it is a participant in the relevant events.

---

[1] These facts came from evidence contained in the Appendix to Plaintiffs' Traditional Motion for Partial Summary Judgment (Motion Appx.), which is included in the same document file as Plaintiffs' Motion, unless otherwise stated.

[2] Motion Appx. at 544.

[3] Motion Appx. at 544.

[4] Motion Appx. at 545.

## 2. Thompson and Mann form a business relationship.

[¶ 11]  Thompson and Mann met in 2022, after which Mann began offering her investment advice on alternative investments.[5]  Using Christy 2017, Thompson then began investing millions into Anchor-managed funds.[6]

[¶ 12]  In September 2024, Mann asked Thompson to loan Anchor money so he could buy out one of Anchor's partners.[7]  She agreed contingent upon Mann providing a personal financial statement and loan guarantee.[8]  Mann signed a Secured Promissory Note, Security Agreement, and Mann's Personal Guaranty to memorialize this agreement (Loan).[9]

[¶ 13]  The parties amended this agreement three months later after Mann requested additional funds to buy out another Anchor partner.[10]

[¶ 14]  Based on their existing business relationship, Thompson later offered Mann employment as the Family Office's Co-President and Chief

---

[5] Motion Appx. at 545.

[6] Motion Appx. at 545.

[7] Motion Appx. at 67.

[8] Motion Appx. at 546.

[9] Motion Appx. at 69–89.

[10] Motion Appx. at 547.

Investment Officer.[11] Through these roles, Mann was to lead the Family Office's alternative investments sector, report solely to Thompson, and join the "dual authority" group.[12] As part of the "dual authority" group, Mann could initiate and approve wire transfers with another group member's approval.[13] Mann accepted the employment offer and the parties executed the Employment Agreement, effective January 1, 2025.[14]

[¶ 15] Under the Employment Agreement, Mann's primary duties were to recruit and build an "alternative investments" team, develop investing strategy, and originate, close on, and responsibly oversee the company's alternative investments.[15] He was also to (i) regularly communicate with Thompson and Michael Lin (the Family Office's Chief Legal Officer) and (ii) ensure Thompson vetted Mann's investment decisions.[16] Mann was not

---

[11] *See* Motion Appx. at 109.

[12] Motion Appx. at 549–50.

[13] Motion Appx. at 549–50.

[14] Motion Appx. at 109, 22.

[15] Motion Appx. at 123–24.

[16] Motion Appx. at 123–24.

allowed to commit any Thompson entity to any new alternative investment without getting Thompson's written pre-approval.[17]

[¶ 16]  Mann began work on January 1, 2025.  Within a few weeks, he allegedly committed Christy 2017 to five separate investments.  It is undisputed that Thompson did not give prior written approval for any of these investments (the Subject Investments).[18]

[¶ 17]  In early February 2025, weeks after Mann signed the first subscription agreement, Thompson was told about Mann's investments.[19]  In response, she called for weekly in-person meetings between Mann and the Family Office's management so the group could track Mann's activities and investigate his past actions.[20]  Mann responded by expressing extreme frustration and, according to Lin, said he was resigning.[21]

---

[17] Motion Appx. at 123.

[18] Motion Appx. at 550–52.  During oral arguments, defendants asserted that they believed these investments also received written pre-approval from Ms. Thompson, however, they did not request a continuance on this motion nor were they able to point to any evidence suggesting the investments received written pre-approval.

[19] Motion Appx. at 552.

[20] Motion Appx. at 552–53.

[21] *See* Motion Appx. 369–70, 72, 76.

[¶ 18] On February 28, 2025, Lin and Ted Spence (the Family Office's Chief Operating Officer) told Mann that the Family Office was accepting his resignation offer.[22] After Mann denied having offered to resign, Lin responded by stating Mann was then being terminated for cause due to his Subject Investments commitments.[23] Lin reported Mann's alleged firing the next day.[24]

[¶ 19] On May 5, 2025, Thompson exercised her rights to inspect the Collateral and verify that her Loan to Anchor was adequately protected.[25] To adequately inspect the Collateral, Thompson asked Anchor to provide access to its "books and records."[26]

[¶ 20] Throughout that month, the parties frequently communicated about the books and records request.[27] But by early June, Thompson claimed that Anchor failed to produce the requested information.[28] So, on June 16th

---

[22] Motion Appx. at 61–62.

[23] Motion Appx. at 61–62.

[24] *See* Motion Appx. 532.

[25] Motion Appx. at 378–79.

[26] Motion Appx. at 79.

[27] *See* Motion Appx. at 381–86.

[28] Motion Appx. at 62–63.

her outside counsel sent a letter requesting additional documents and answers to specific questions.[29]

[¶ 21]  Mann sent multiple replies but refused to provide an audited personal financial statement that Thompson requested.[30]  So, on June 26th Thompson's counsel sent another letter regarding these issues.[31]  When Mann did not respond to the June 26 letter, Thompson's counsel sent a further letter on July 2nd detailing the precise list of necessary, outstanding documents requested, which was later updated with two more letters.[32]

[¶ 22]  Thompson claims that, to date, Anchor has not cured any outstanding deficiencies highlighted in her last July letter, which she says are an Event of Default under both the Note and Security Agreement.[33]  So, on July 22, 2025, Thompson served Anchor with a default notice and accelerated the Loan.[34]

---

[29] Motion Appx. at 395.

[30] *See* Motion Appx. at 398, 400–01.

[31] Motion Appx. at 404–05.

[32] Motion Appx. at 411–49

[33] Motion Appx. at 554–55.

[34] Motion Appx. at 450–52.

## B. Procedural Background

[¶ 23] Plaintiffs sued in August 2025.[35] Defendants answered.[36] Plaintiffs filed this motion on January 20, 2026.[37] Plaintiffs' filed their First Amended Petition the next month.[38]

[¶ 24] Defendants opposed Plaintiffs' motion.[39]

## II. APPLICABLE LAW

## A. Summary Judgment Standards

[¶ 25] At any time, a party may move with or without supporting evidence for a summary judgment as to all or any part of any causes of action asserted against it. TEX. R. CIV. P. 166a(b). The motion must state its specific grounds. *Id.* at 166a(c).

[¶ 26] Thereafter, the court *shall* render judgment if the pleadings, summary judgment filings, and properly filed evidence show that, except as to

---

[35] *See generally* Plaintiffs' Original Petition (POP).

[36] *See generally* Defendants' Original Answer, Affirmative and Other Defenses, and Request for Attorneys' Fees (Orig. Answer). Defendants later filed counterclaims but none are at issue for purposes of this motion. *See generally* Defendants' First Counterclaims Against Plaintiffs.

[37] *See generally* Motion.

[38] *See generally* First Amended Petition (FAP).

[39] *See generally* Defendants' Opposition to MSJ (Opp.).

the amount of damages, there is no *genuine* issue as to any *material* fact and the movant is entitled to judgment as a matter of law on the issues stated in the motion or in an answer or any other response. *Id.*; *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021).

[¶ 27] A court can grant a defendant movant's traditional summary judgment only if the movant's evidence as a matter of law either proves all elements of its defense or disproves at least one element of the nonmovant's claim. *See e.g.*, *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995) (causation disproved as a matter of law).

[¶ 28] So a summary judgment motion

> ...is essentially a motion for a pretrial directed verdict. * * * Once such a motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. * * * [Courts] review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. * * *

*Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006) (citations omitted).

[¶ 29] A genuine fact issue exists if more than a scintilla of evidence supports the alleged fact. *See Amazon.com Servs. LLC v. Grant*, No. 05-23-

01306, 2024 WL 5053063, at *2 (Tex. App.—5th Dist. Dec. 10, 2024, no pet.). Evidence is more than a scintilla when it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *King Ranch v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.3d 706, 711 (Tex. 1997)). However, less than a scintilla exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

[¶ 30] When a contract's terms are unambiguous and the material facts are undisputed, compliance with those terms is a question of law. *Hrdy v. Second St. Props.*, 649 S.W.3d 522, 554 (Tex. App.—1st Dist. 2022, pet. denied).

**B. Contract Construction**

[¶ 31] A court's primary objective when construing contracts "is to ascertain and give effect to the parties' intent as expressed in the instrument." *U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 387 (Tex. 2023) (quoting *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018)).

[¶ 32] Usually, courts deem the contract alone to express the parties' intent because it is objective, not subjective, intent that controls. *Id.*

[¶ 33]   With unambiguous contracts, courts "can determine the parties' rights and obligations under the agreement as a matter of law." *Inwood Nat'l Bank v. Fagin*, No. 24-0055, 2025 WL 349890, at *4 (Tex. 2025) (per curiam) (quoting *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)).

## III.   ANALYSIS

### A. Introduction

[¶ 34]   Plaintiffs sought the following summary judgment rulings: (i) Anchor breached the Note and Security Agreement; (ii) Mann is jointly and severally liable with Anchor on the Note based on the Guaranty; (iii) Mann breached the Employment Agreement; and (iv) Mann is not entitled to any Incentive Compensation.[40]

[¶ 35]   Defendants responded that the court should deny the motion because (i) Anchor complied with the books and records demands, meaning there is no basis for acceleration nor Note and Security Agreement breach; (ii) Mann complied with the Guaranty's terms; (iii) the requested Employment Agreement relief is impermissible since plaintiffs did not allege any resulting

---

[40] *See generally* Motion ¶s 4.1–4.4.

damages and is otherwise barred by Mann's affirmative defenses;[41] and

(iv) TPC's inability to decide whether Mann was terminated for cause or

resigned shows there is a fact issue preventing declaratory relief.[42]

## B. Note and Security Agreement Breach

### 1. Applicable Law

[¶ 36]  To prevail on a breach-of-contract claim,[43] the plaintiff must

prove that: (i) there is a valid contract; (ii) the plaintiff performed its

obligations under the contract; (iii) the defendant breached the contract; and

(iv) the plaintiff sustained damages as a result of the breach.  *Pathfinder Oil &*

*Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

[¶ 37]  Neither party contests that the Note and Security Agreement is

a valid contract nor that Thompson performed her duties under the Note and

Security Agreement.  Thus, the only remaining elements are whether Anchor

---

[41] Because the court concluded that plaintiffs did not allege any remediable damages the court did not address Mann's raised affirmative defenses of substantial compliance, waiver, and quasi-estoppel.

[42] *See generally* Opp.

[43] POP (the then-live pleading) outlined the elements for a breach of contract rather than a breach of a promissory note for this cause of action.  *Compare* POP ¶s 6.6–6.12 *with* Motion ¶ 5.3.  Because the actual underlying breach at issue is Anchor's alleged failure to provide Thompson with the requested books and records—predicating the acceleration—the court analyzes this cause of action as a standard breach-of-contract claim.  Regardless, analyzing the cause of action as a breach of promissory note would not lead to a different result.

breached the Note and Security Agreement (NSA) and whether Thompson was injured as a result.

### 2. Breach

#### a. Introduction

[¶ 38]   Texas affirms parties' contractual autonomy and ability to define their contractual terms.  *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018).   Here, the parties' NSA gave Thompson the right to inspect Anchor's "books and records" to ensure the Collateral was adequately protected.[44]   However, the NSA does not define "books and records," and the parties disagree on its meaning and thus whether Anchor complied with that obligation.

#### b. Applicable Law

[¶ 39]   Determining whether the contract is ambiguous is a threshold question because only after a contract is found to be ambiguous may parol evidence be admitted to ascertain the parties' intent.  *A.W. Wright & Assocs., P.C. v. Glover, Anderson, Chandler & Uzick, L.L.P*, 993 S.W.2d 466, 470 (Tex.

---

[44] Motion Appx. at 79.

App.—14th Dist. 1999, pet. denied) (citing *Friendswood Dev. Co v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996)).

[¶ 40] "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Nat. Union Fire. Ins. Co. of Pitt., PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Contract ambiguity may be either "patent" or "latent." *Id.* Patent ambiguity is evident on the contract's face, whereas latent ambiguity arises when a contract is facially unambiguous but ambiguity appears by reason of some collateral matter. *Id.*

[¶ 41] However, "ambiguity does not arise simply because the parties advance conflicting interpretations of the contract." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). "For an ambiguity to exist, both interpretations must be *reasonable*." *Id.* (emphasis in original).

### c. Thompson's arguments

[¶ 42] Thompson claims that Anchor first breached the NSA when it failed to give her access to inspect and copy its "books and records" "related

to the Collateral."[45]  According to Thompson, this was an "Event of Default" under the NSA enabling her to accelerate payment on the Note.[46]  She further alleges that Anchor again breached the Note by failing to pay the accelerated Note balance.[47]

### d. Anchor's arguments

[¶ 43]  Anchor responded that it complied by producing over 2,300 pages of documents to Thompson.[48]  Anchor alternatively argues that even if it failed to fully comply with the books and records requests, equitable principles preclude acceleration.[49]

### e. Decision

[¶ 44]  The court agrees with Anchor.  To begin, the NSA does not define the phrase "books and records." While the parties disagree on its meaning neither party expressly posits how the phrase "books and records" should be defined.[50]

---

[45] Motion ¶s 5.5–5.6.

[46] Motion ¶s 5.10–5.11.

[47] Motion ¶s 5.11, 5.13.

[48] Opp. at 22–24.

[49] Opp. at 29–30.

[50] *See generally e.g.*, Motion.

[¶ 45]  Thompson simply says that she is still missing documents necessary to determine the "carried interest" or "carry" that Anchor's subsidiaries earn.[51]  She alleges that Anchor had to produce this information because it is "related to the Collateral."[52]

[¶ 46]  There is no indication the parties intended "books and records" to have a specialized meaning.  So, the court strives to give the phrase its plain and ordinary meaning.  *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009).  However, the court did not find "books and records" defined in dictionaries or books discussing common usages.[53]  Nor do statutory terms necessarily fit because legislatures define the terms for specific purposes not common purposes.  *See e.g., Crow-Williams, I v. Fed. Pac. Elec. Co.*, 683 S.W.2d 523, 524 (Tex. App.—5th Dist. 1984, no writ) (statutory definitions of "subcontractor" developed for specific purposes).  So, the court concludes that the phrase's natural meaning here is: those documents that would allow a reasonable person to assess the Collateral's current value.

---

[51] Plaintiffs' Reply in Support of Motion (Reply) ¶s 5, 7.

[52] Motion ¶ 5.5.

[53] *See generally* BLACK'S LAW DICTIONARY (12th ed.); BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE (3d ed. 2011); BRYAN A GARNER, GARNER'S MODERN ENGLISH USAGE (4th ed. 2016).

[¶ 47]   The Security Agreement defines "Collateral" as:

> 1.2    Collateral. The Collateral shall consist of Grantor's tangible and intangible property and other tangible and intangible assets of Grantor wherever located, whether now owned or hereafter acquired, and any additions, replacements, accessions, or substitutions thereof and all Cash and non-Cash Proceeds and any products thereof, as set forth on Exhibit A attached hereto and incorporated herein.  In no event shall anything herein be construed to limit the collateral secured by any other Loan Document.[54]

That is, Collateral is anything that Anchor owns, or might own in the future, that could be used to satisfy its obligations to Thompson.

[¶ 48]   Because the Collateral's value here depends on the carried interests, the only reasonable interpretation of "books and records related to the Collateral" includes documents necessary to determine the "carried interests' values."  Accordingly, the NSA is not ambiguous.

[¶ 49]   The uncontroverted evidence shows that Anchor provided thousands of documents it believed were fully responsive to Thompson's books and records requests.[55]  Further evidence shows that Anchor and its

---

[54] Motion Appx. at 78.

[55] Opp. at 23; *see generally* Opp. 2 Appx.

employees followed up numerous times seeking clarification on what documents were still missing.[56]

[¶ 50]  Thompson asserts that she provided clarifications yet is still missing documents necessary to determine Anchor's carried interest.[57]  She claims she needs records that can help her identify (i) the amount invested, (ii) an ROI multiplier, and (iii) the carry percent.

[¶ 51]  The court concludes that Anchor provided at least a scintilla of evidence that it met its contract duty.[58]

## 3. Conclusion

[¶ 52]  Accordingly, the court denies plaintiffs' summary judgment motion on the NSA breach because there is a genuine issue of material fact whether Anchor met its contract duty. [59]

---

[56] *See e.g.*, Opp. 1 Appx. at 57–59, 61, 64–66.

[57] Reply ¶s 5, 7.

[58] *See* Opp. 2 Appx. at 439–40 (ROI multiplier), 1399 (amount invested), 1771 (carry percent).

[59] Having determined that a genuine issue of material fact exists on the breach element, the court need not further analyze the damages and acceleration issues.

## C. Guaranty Breach

[¶ 53]   Thompson argues that Mann breached the Guaranty by failing to (i) ensure Anchor complied with the NSA's books and records disclosure obligations; (ii) ensure Anchor paid the accelerated balance; and (iii) provide an audited personal financial statement.[60]

[¶ 54]   For the reasons stated in part III(B) above, there are genuine material fact disputes on the first two grounds.  Thus, the court analyzes the only remaining issue—whether Mann was required to submit an audited financial statement.

[¶ 55]   Although Mann provided Thompson a personal financial statement, she claims he breached the Guaranty by not providing an *audited* personal financial statement, as she requested.[61]  That is, because the financial statement Mann provided was not audited, Thompson argues it was not in the required "form."[62]

[¶ 56]   Under the Guaranty's terms, Mann agreed to provide Thompson, at her request, his "personal financial statement, *in form and substance*

---

[60] *See* Motion ¶s 5.15–5.18.

[61] Motion ¶ 5.17.

[62] *See* Motion ¶ 5.17.

*reasonably satisfactory* to the Lender."[63]  However, the Guaranty does not say that the financial statement had to be audited.

[¶ 57]  "Reasonableness has always entailed an *objective* inquiry." *Freeport-McMoRan Oil & Gas LLC v. 1776 Energy Partners, LLC*, 672 S.W.3d 391, 399 (Tex. 2023) (emphasis in original); *see also* RESTATEMENT (SECOND) OF TORTS § 283 cmt. c (AM. LAW INST. 1965) (the "reasonable man" standard is "an objective and external one").  Further, reasonableness is generally considered a fact question.  *See Freeport*, 672 S.W.3d at 399. (citing *Collora v. Navarro*, 574 S.W.65, 68 (Tex. 1978)).

[¶ 58]  Here, Thompson did not offer any evidence purporting to prove that submitting an audited statement was the only reasonable way to perform. Stated differently, Thompson did not conclusively prove that Mann's unaudited statement was unreasonable.  Thus, at a minimum, a fact issue exists as to whether Mann's financial statement was "in form and substance reasonably satisfactory to" Thompson.  *See Teel v. Hosp. Partners of Am. Inc.*, No. H–06–3991, 2008 WL 346377, at *8 (S.D. Tex. Feb. 6, 2008) (fact issue existed whether release agreement was reasonably effective).

---

[63] Motion Appx. at 91. (emphasis added).

[¶ 59]   Accordingly, the court denies plaintiffs' summary judgment motion as to the alleged Guaranty breach.

## D. Employment Agreement Breach

[¶ 60]   TPC seeks summary judgment as to liability on its claim that Mann breached his Employment Agreement when he committed Christy 2017 to the Subject Investments.[64]  Specifically, TPC alleges that Mann breached Employment Agreement Exhibit A § 8, which states that one of his "duties and responsibilities" is to not commit any Thompson entity to new alternative investments without Thompson's *written* pre-approval.[65]

[¶ 61]   Mann contests TPC's claim on the ground that TPC failed to prove that the alleged breaches caused damages.[66]  The court agrees.

### 1.  Lack of Damages

[¶ 62]   Damages is a required element for a contract breach claim. *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655 n. 26 (Tex. 2009) (collecting cases) ("Every single court of appeals has likewise held that one of the required elements in a breach-of-contract suit

---

[64] Motion ¶ 5.19.

[65] Motion ¶ 5.20; Motion Appx. at 123 (emphasis added).

[66] Opp. at 33–34.

seeking money damages is the plaintiff was in fact damaged by the breach.").[67]

It is plaintiffs' burden to prove it suffered damages to be entitled to partial summary judgment as to liability. *Pagosa Oil and Gas, L.L.C. v. Marrs and Smith P'ship*, 323 S.W.3d 203, 215 (Tex. App—8th Dist., pet. denied).

[¶ 63]   Although Rule 166a permits a partial summary judgment if the movant shows that, except as to the *amount of* damages, it is entitled to summary judgment, the rule does not permit summary judgment as to liability without proving the existence of damages. TEX. R. CIV. P. 166a(h)(2).[68]

[¶ 64]   The only harm TPC claims to have suffered is its lost right to decide whether it wanted to fund the Subject Investments.[69]   This is legally insufficient. *See Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 861 (Tex. 2017).

[¶ 65]   In *Horizon*, the jury awarded Horizon lost profit damages based on a finding that Horizon would have won a contract absent the defendants'

---

[67] Damages has two components: (i) the breach caused an injury for which the court can provide a remedy and (ii) the amount of damages resulting from that injury. *See Prudential Secs., Inc. v. Haugland*, 973 S.W.2d 394, 396–97 (Tex. App.—8th Dist., pet. denied). The first component is the only component at issue in this motion.

[68] The Supreme Court recently added the words "the amount of" to the rule but that addition was not a change to the existing law. TEX. R. CIV. P. 166a cmt. (2026).

[69] *See* Reply ¶ 21.

misconduct. But the supreme court held that there was no evidence Horizon would have won the contract as opposed to some other company. *Id.* Instead, "it [was] equally plausible that [the contracting company] would have rejected all of the bids had it not accepted [defendants'] proposal." *Id.* In other words, the court held it was "pure speculation to conclude that Horizon would have won the bid." *Id.* Thus, the court held that Horizon failed to establish entitlement to compensable damages. *Id.* at 862.

[¶ 66] The facts here mirror *Horizon*'s. TPC provided no evidence it would not have entered into the Subject Investments but for Mann's alleged unauthorized transactions. Moreover, TPC failed to show that Mann's actions caused any financial injury. TPC's damages are thus speculative and based on the "mere hope for [better] success." *See id.* at 860. But the law is skeptical of claims that, in reality, are little more than wishful thinking. *See Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 280 (Tex. 2015).

[¶ 67] Accordingly, the court denies plaintiffs' motion as to TPC's employment breach claim because TPC did not conclusively prove that Mann's alleged breach caused damages.[70]

---

[70] Although there are similarities, the court's recent decision in *Slant Operating, LLC v. Octane Energy Operating, LLC*, 2025 Tex. Bus 53, 2025 WL 31716372 (8th Div.), which

## E. Incentive Compensation Declaratory Judgment

### 1. Introduction

[¶ 68]   TPC sought a declaration that Mann is not entitled to any further incentive compensation due to either resigning or being fired for cause.[71] Mann responded that TPC's inability to decide whether Mann resigned or was fired for cause presents a fact issue but in either instance is not true.[72] The court concludes that there is a genuine dispute whether Mann resigned, however, TPC conclusively proved it had a basis to fire Mann for cause.

---

likewise dealt with a request for partial summary judgment as to liability on a contract breach claim, is not applicable. In that case, the disputed damages were the value of Slant's lost ability to drill longer horizontal wells due to Octane's breach. *Slant Operating, LLC v. Octane Energy Operating, LLC*, 2025 Tex. Bus. 22, 717 S.W.3d 409, 417–18 (8th Div.). Accordingly, while the extent of damages is similarly speculative in nature, the fact that Slant was harmed was certain—unlike here. *See Slant Operating*, 2025 Tex. Bus 53 ¶ 44 ("[I]f the RRC granted Slant Operating's application to drill the Gardendale Wells on Octane's leasehold, Octane would have breached the Letter Agreement by not providing the requested waiver, and Slant Operating would have a breach-of-contract claim. Slant Operating would still suffer damages, including expenses related to the drilling redesign.")

[71] Motion ¶ 5.24.

[72] Opp. at 39.

## 2. Background

[¶ 69]   Mann's entitlement to incentive compensation ends if he either voluntarily resigned or was fired for cause.[73]   Thus, he would be entitled to incentive compensation only if TPC fired him without cause.[74]

[¶ 70]   To support its claim, TPC points to an internal March 1, 2025, email and a separate May 1, 2025, follow-up email Lin sent Mann, both stating that Mann was either fired for cause or resigned.[75]   However, Mann swore that he never resigned.[76]

[¶ 71]   A party moving for summary judgment on a declaratory judgment claim must conclusively prove that no genuine issue of material fact exists, and that it is entitled to the requested relief as a matter of law.  *Lil C Ranch, LLC v. Ridgefield Eagle Ford Min., LLC*, No. 14-21-00285-CV, 2023 WL 2386940, at *4 (Tex. App.—14th Dist. Mar. 7, 2023, no pet).

[¶ 72]   Because there is a factual dispute whether Mann resigned, the court denies TPC summary judgment on that premise that Mann allegedly

---

[73] Motion ¶ 5.25; Motion Appx. 114.

[74] *See* Motion ¶ 5.25.

[75] *See* Motion Appx. at 376, 532.

[76] Opp. at 39; Opp. 1 Appx. at 12.

resigned. Thus, the remaining issue is whether TPC conclusively proved that cause existed to fire Mann.

[¶ 73] Employment Agreement § 3(a)(iv) provides the potential bases for firing Mann with cause.[77] TPC asserts various bases it could have used, including: (i) misfeasance and misappropriating TPC property; (ii) violating a TPC rule, procedure, or policy; (iii) self-dealing, as to the Subject Investments; or (iv) sending denigrating threats.[78]

[¶ 74] Bases (i) through (iii) concern Mann's alleged unauthorized Subject Investments without written pre-approval.[79] Meanwhile, basis (iv) concerns texts Mann sent to other employees in late-February 2025.[80] TPC provides supporting evidence for both grounds.[81]

[¶ 75] Mann opposes all the alleged for-cause bases. He first asserts that TPC could not fire him for cause without providing written notice.[82] Second, he argues that TPC lacks legal justification for bases (i) through (iii)

---

[77] Motion Appx. at 112–13.

[78] Motion ¶ 5.27 n.17; Motion Appx. at 112–13.

[79] *See* Motion ¶ 5.27 n.17.

[80] *See* Motion ¶ 5.27 n.17.

[81] *See* Motion Appx. at 370–372, 74, 553.

[82] Opp. at 40.

because Thompson allegedly waived the written pre-approval requirement through oral approvals.[83] Finally, he asserts that the text messages merely expressed his frustration at the situation and were neither offensive nor denigrating.[84]

[¶ 76] The court addresses Mann's arguments in turn.

### 3. Written Notice

[¶ 77] Within the various bases for "cause," some include a specific requirement that TPC give Mann written notice of the complained-of conduct so that he has an opportunity to cure, whereas others do not.[85]

[¶ 78] For example, Employment Agreement § 3(a)(iv)(I) provides that TPC can fire Mann for cause for the "[e]mployee's breach of, or failure to comply with or observe, any provision of this Agreement which has continued for fourteen (14) days following *receipt of written notice from the Company* of such breach or failure."[86] However, Employment Agreement § 3(a)(iv)(E)

---

[83] Opp. at 40–41.

[84] Opp. at 41.

[85] *See* Motion Appx. at 112–13.

[86] Motion Appx. at 113 (emphasis added).

allows TPC to fire Mann upon his "indictment (or similar criminal charge) or conviction of any felony."[87]

[¶ 79]  TPC does not assert it fired Mann for any of the bases requiring written notice.  Nevertheless, Mann simply argues that because some of the for-cause bases require written notice that he was necessarily entitled to written notice for all the alleged bases.[88]

[¶ 80]  However, the Employment Agreement's plain language controls.  *Apache Corp. v. Apollo Expl., LLC*, 670 S.W.3d 319, 330 (Tex. 2023).  "Courts may not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained." *Am. Midstream (Ala. Intrastate), LLC v. Rainbow Energy Mktg. Corp.*, 715 S.W.3d 572, 579 (Tex. 2025).

[¶ 81]  Had the parties wished that every for-cause basis include a notice requirement they could have included that language.  By choosing to include written notice provisions in some bases and not others, the court must presume that was part of the parties' conscious bargaining process and respect

---

[87] Motion Appx. at 112.

[88] *See* Opp. at 40.

that decision. *See id.* at 580 (refusing to read in restrictive language not in the contract).

[¶ 82]   Because TPC's alleged bases for firing Mann with cause do not contain any written notice requirements, the failure to prove that Mann was given written notice of his termination for cause does not create a fact issue precluding summary judgment on this issue.

### 4. Waiver

#### a. Legal Standards

[¶ 83]   "Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *LaLonde v. Gosnell*, 593 S.W.3d 212, 218–19 (Tex. 2019) (internal quotations omitted).

[¶ 84]   Waiver is an affirmative defense, TEX. R. CIV. P. 94, and the moving party has no duty to negate a nonmovant's pleaded affirmative defenses. *Woodside v. Woodside*, 154 S.W.3d 688, 691 (Tex. App.—8th Dist. 2004, no pet.). An affirmative defense will prevent granting summary judgment if the nonmovant raises a genuine issue of material fact on each affirmative defense element. *Id.* at 691–92.

[¶ 85]   So, to defeat summary judgment based on waiver, Mann had to raise a fact issue on whether plaintiffs (i) had an existing right, benefit, or

advantage; (ii) had actual knowledge of its existence; and (iii) intended to relinquish their right or acted inconsistently with that right. *See Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008).

[¶ 86] The mere presence of a nonwaiver clause does not mean that waiver did not occur. Included within the waiver doctrine is the concept of individual self-determination. *Shields Ltd. P'Ship v. Bradberry*, 526 S.W.3d 471, 482 (Tex. 2017). So, a party can decide to waive a particular provision, if it is in its best interest. *Id.* at 483.

[¶ 87] Nevertheless, nonwaiver provisions are generally "facially dispositive." *Id.* at 481. So, the court must analyze the party's actions and determine if the surrounding facts and circumstances show that Thompson "manifest[ed] clear intent to waive the nonwaiver provision." *See id.* at 481.

[¶ 88] The nonwaiver clause at issue here states:

> Neither the waiver by either Party of any breach of or default under any of the provisions of this Agreement, nor the failure of either Party to enforce any of the provisions of this Agreement or to exercise any right hereunder, will hereafter be construed as a waiver of any subsequent breach of default, or a waiver of any rights or provision hereunder. No waiver shall be effective unless it is in writing and signed by the Party making such waiver.[89]

---

[89] Motion Appx. at 120.

[¶ 89]   Thus, to prevail on his waiver argument, Mann had to adduce evidence that Thompson's alleged oral approvals demonstrated an intent to waive or conduct that was inconsistent with (i) the requirement that Mann receive her written approval before committing TPC to alternative investments and (ii) the nonwaiver clause's "in writing" provision. *See id.* at 481 (requiring waiving both late rent payments and nonwaiver clause); *Galactic Power LLC v. Pickens Res. Corp.*, No. 4:23-CV-00405-SDJ-AGD, 2024 WL 4101939, at *13 (N.D. Tex. 2024) (same).   That is, orally waiving the written pre-approval provision of the Employment Agreement is ineffective unless there is also evidence of waiving the portion of the nonwaiver provision that says waivers are not effective unless they are in writing.

### b.  Analysis

[¶ 90]   For starters, it is undisputed that despite not giving Mann written pre-approval for the Subject Investments, TPC funded them.[90]  But, as TPC asserts, funding the Subject Investments does not mean Thompson

---

[90] Opp. at 37; Reply ¶ 28.

intended to waive the pre-approval requirement when the alternative meant facing personal liability.[91]

[¶ 91]  However, Mann presented some evidence that (i) the parties were communicating about investing into the Subject Investments for months prior to their execution and Mann's employment and (ii) that Thompson gave oral pre-approvals.[92]

[¶ 92]  These alleged pre-approvals are prior *affirmative* conduct inconsistent with enforcing Thompson's right that Mann first get her written approval.  Assuming the veracity of Mann's summary judgment evidence, Thompson's oral approvals of the Subject Investments could have led Mann to "reasonably believe[] strict compliance" with the written pre-approval provision would not be required.[93]  *See Fritz Mgmt., LLC v. Huge Am. Real Est., Inc.*, No. 05-00332-CV, 2022 WL 3500011, at *6 (Tex. App.—5th Aug. 18,

---

[91] Reply ¶ 28; *see also* Motion Appx. at 134, 138 (executed subscription agreement for one of the Subject Investments stating the investor was "committing to contribute to the capital" of the investment).

[92] *See* Opp. 1 Appx. at 8–9, 174–76.

[93] Opp. 1 Appx. at 8–9.  These facts are distinguishable from *Dallas Sports Group, LLC v. DSE Hockey Club, L.P.*, 2026 Tex. Bus. 15, __ S.W.3d __ (1st Div.).  In *Dallas Sports Group*, the Stars asserted that the Mavericks implicitly waived the contracts' nonwaiver provisions through inaction (as opposed to affirmative conduct).  *Id.* ¶s 128–133.  Thus, the court's waiver analysis in *Dallas Sports Group* is inapposite to the facts here.

2022, pet. denied) (evidence of oral approval sufficient to make party believe written consent provision would not be required).

[¶ 93]   Evidence supporting Mann's position exists through the parties' (i) long-standing business relationship, (ii) sophistication, and (iii) dealings as to these specific investments in the months leading up to Mann's hire.  *See id.* (similar attributes supporting existence of a fact issue).  Likewise, given Mann started executing these investments on January 2, 2025, (the day after his hire) yet Thompson did not complain until February 23, 2025, (after execution and financing) suggests she may have initially approved them.

[¶ 94]   Nevertheless, Mann failed to present evidence that Thompson also intended to waive the nonwaiver provision's requirement that waivers be in writing and signed by Thompson to be effective.

[¶ 95]   "While waiver may sometimes be established by conduct, that conduct must be unequivocally inconsistent with claiming a known right." *Shields*, 526 S.W.3d at 485.  Thompson's alleged oral pre-approvals may be inconsistent with the Employment Agreement's written pre-approval requirement, but they are not inconsistent with the nonwaiver provision's writing requirement.  *See id.* (continued acceptance of rental payments not inconsistent with party claiming its rights under the nonwaiver provision).

[¶ 96] As the supreme court held, "[t]he many flavors in which nonwaiver provisions may present are as varied as human capacity for language and bargain, leaving [courts] bereft of an option for specifically delineating the circumstances under which a nonwaiver agreement may be waived *vel non*." *Id.* at 484. The outcome might be different if the nonwaiver provision did not have a required writing component. *Compare id.* (no waiver because nonwaiver provision expressly required all waivers be in writing and no such writing existed) *with 12636 Res. Ltd. v. Indian Bros., Inc.*, No. 03-19-00078, 2021 WL 417027, at *9 (Tex. App.—3rd Dist. Feb. 5, 2021, no pet.) (waiver because nonwaiver provision *did not* expressly require waivers be in writing).

[¶ 97] Because Mann failed to produce any evidence that Thompson intended to waive the nonwaiver provision's writing requirement, Mann did not raise a fact issue on waiver.

### 5. Text Messages

[¶ 98] Having concluded that TPC had a for-cause basis to fire Mann because of the Subject Investments, the court need not address the text messages issue.

### 6. Conclusion

[¶ 99]  Accordingly, the court concludes that TPC has conclusively proven that Mann was fired for cause and thus grants TPC's request for declaratory relief.

### IV.  CONCLUSION

[¶ 100]  The court concludes that plaintiffs are entitled to summary judgment on only the declaratory judgment claim that Mann is not entitled to his incentive compensation.

[¶ 101]  Otherwise, the court denies plaintiffs' motion.

So ORDERED.

_____
BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED:  May 4, 2026

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 114435561
Filing Code Description: No Fee Documents
Filing Description: Opinion and Order on Plaintiffs' Motion for Summary Judgment
Status as of 5/4/2026 12:51 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Alex More | | amore@ccsb.com | 5/4/2026 12:01:51 PM | SENT |
| Monica E.Gaudioso | | mgaudioso@ccsb.com | 5/4/2026 12:01:51 PM | SENT |
| Robert C.Rowe | | rrowe@ccsb.com | 5/4/2026 12:01:51 PM | SENT |
| LeElle BSlifer | | lslifer@winston.com | 5/4/2026 12:01:51 PM | SENT |
| Aaron C. O'Dell | | ACODell@winston.com | 5/4/2026 12:01:51 PM | SENT |
| Nathaniel R.Lee | | NLee@winston.com | 5/4/2026 12:01:51 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 5/4/2026 12:01:51 PM | SENT |
| Marco Plata | | mplata@ccsb.com | 5/4/2026 12:01:51 PM | SENT |
| Docket South | | ecf_houston@winston.com | 5/4/2026 12:01:51 PM | SENT |
| Ryan Faulkner | | RFaulkner@winston.com | 5/4/2026 12:01:51 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 5/4/2026 12:01:51 PM | SENT |
| Jamie Vargo | | jvargo@winston.com | 5/4/2026 12:01:51 PM | SENT |
| Lance Currie | | lcurrie@ccsb.com | 5/4/2026 12:01:51 PM | SENT |
| Sarah Frisbee | | sfrisbee@ccsb.com | 5/4/2026 12:01:51 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 5/4/2026 12:01:51 PM | SENT |